## MANHATTAN BOOK CASING MACH. CO. v. E. C. FULLER CO.

(Circuit Court, S. D. New York. January 3, 1912.)

1. Patents ⬅118—Disclosure in operable form essential to pioneer invention.

A patent, which was the first that purported to disclose a machine by which certain work could be done, so as to be fairly within the definition of a pioneer patent, is not entitled to rank as such patent, unless it is accompanied by disclosure, which shows the art how the idea stated in the claim may be realized in an operable structure.

2. Patents ⬅118—Faults in diagrams, which mechanic could not correct, defeat patent.

Though faults in diagrammatic representations do not defeat a patent, if the drawings show at least enough for the ordinary skilled mechanic to build the machine, the drawings must, to make an operable disclosure, be sufficient to enable such mechanic to build a machine, or the disclosure is not operable.

3. Patents ⬅118—Evidence held to show defects in disclosure rendering machine inoperable.

In a suit for infringement of a patent, evidence *held* to show that there were such defects in the machine disclosed by the patent as rendered it inoperable.

4. Patents ⬅118—Evidence held not to show defects could be overcome by mechanic.

In a suit for infringement of a patent, evidence *held* to show that the defects in the construction of the machine as disclosed by the patent were such as could not be overcome by a skilled mechanic.

5. Patents ⬅129—Patentee cannot claim improvement covered by subsequent patent was mechanical only.

A patentee, who had received a subsequent patent covering improvements in the machine covered by the earlier patent, cannot claim that such improvements were merely mechanical and did not involve invention, and therefore cannot claim that a machine constructed under the later patent established that the disclosure in the earlier patent possessed only such defects as a skilled mechanic could overcome.

6. Patents ⬅118—Evidence held not to show operation of machine constructed under patent.

In a suit for infringement of a patent where the defense was that the patent did not disclose an operable machine, evidence *held* not to show that machines which had been actually operated were constructed under the patent in suit.

7. Patents ⬅91 (4)—Evidence held not to show that subsequent patentee had taken prior patentee's idea.

In a suit for infringement of a patent, where the defense was that the disclosure in the patent was not operable, evidence *held* not to es-

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tablish complainant's contention that defendant had taken the idea from the prior patent, and made it profitable by the use of its greater ingenuity and resources.

In Equity. Suit for infringement of a patent by the Manhattan Book Casing Machine Company against the E. C. Fuller Company. Bill dismissed.

This is the usual bill in equity upon patent No. 603,406, for a machine to apply "cases" or cardboard covers to books. When books have been sewed together, they must have the outer sheets covered with paste, upon which the cover is then pressed. The cover keeps to the book only by the tenacity of the paper and of a small piece of stiff muslin at the back, the loose ends of which are likewise pasted to the cover between it and the outer sheets. Before the invention here patented, this work had universally been done by hand. Only one claim of the patent, No. 6, is in suit: "A machine for binding books, comprising a suitable frame, a glue or paste pot mounted therein, a book-carying frame provided with a horizontal support which projects over the glue or paste pot, and from which the book is suspended, and operative devices for applying the glue or paste to the sides of the book, substantially as shown and described."

The disclosure was of a somewhat complicated machine which lowered the book, hanging upon a horizontal support, inserted between the leaves; when lowered, two paste plates came into contact with the outer leaves, and then the book was raised, the outer leaves having an even coating of paste upon them. As it rose it took up the "case" or cover with it, which had been spread out by hand upon two horizontal plates, below the level of which the top of the book had dropped. The sides of the cover dropped upon the wet leaves as the book rose, and the book with its cover was then taken off by the hand of the operative, the "case" registered upon the book, and the plied for another patent, No. 677,040, for an improved machine, designed upon the surface of the vertical paste plates by a mechanism which rotated them in a paste pot which was hung below the level to which the book descended.

The patent appeared on May 3, 1898, and on June 5, 1900, the patentee applied for another patent, No. 677,040, for an improved machine, designed upon the same theory and operating in general in the same way, but with changes in the devices disclosed. This machine was actually made and put into operation in five instances, but has subsequently been displaced by the defendant's machine.

The infringing machine is a highly complicated piece of mechanism, which performed many functions, not necessary to indicate in detail. It does, however, carry the book upon a support in the form of an inverted V and lowers it between two paste pots. These pots are then brought together till rollers at their inner sides come in contact with the leaves close under the "shoulder" of the book. The book is then raised, and the rollers at the same time rotate, depositing a coating of paste upon the surface of the leaves. Meanwhile, while the book is at its lowest level, a "case" is automatically fed upon horizontal plates above the book, which "case" is carried up with the book, as in the case of the patent. As the book rises with the "case," clamping devices press the "case" to the book, and it is afterwards carried away upon the support.

The defenses are noninfringement and that the patent is not operable as disclosed.

Boardman Wright, of New York City, for complainant.
James C. Rice, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). [1] There can be no question that the patent was the first that purported to disclose a machine by which books could be coated with paste and take up the "case," or cover, in position to be registered and sent

to the press. As such it might fairly be within the definition of a pioneer patent, and its claims receive the scope in interpretation accorded to such patents, provided it disclosed one way in which this function could in fact be performed. However, even a pioneer patent must be accompanied with a disclosure, which will show the art how the idea stated in the claim may be realized in an operable structure. It is, of course, not enough merely to conceive abstractly of a combination of elements which will together do something new. Invention requires the added element of showing how the idea may be actually incorporated, and without such a disclosure as would enable a skilled artisan to embody the idea it remains sterile, and makes no advance in the art, from which the man conceiving the idea should be entitled to a monopoly. While, therefore, in the case at bar the court ought not to ask for a perfected or finally developed machine, still it is a condition that the patentee must show at least in one practicable form how his idea may be used, else he is at best only an ingenious theorist, and not an inventor at all.

[2] Now, it is here in evidence with no contradiction at all, as I shall show later, that the machine actually disclosed by the patent was inoperable. If the faults were merely in the diagrammatic representations, that would not be a defense, for diagrams or descriptions are not meant for working drawings. Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 48 C. C. A. 72. But such drawings must at least show enough for the ordinary skilled mechanic to build the machine, correcting the discrepancies and the difficulties appearing in the drawings, by means of that store of expert information which such men will bring to the task in a bona fide effort to make the machine work. Some of the difficulties raised by the defendant are of this correctible character, but several are not.

[3] The defendant raises in his brief nine objections to the disclosure, all of which are unanswered by any technical witness. I will take up separately Nos. 1, 4, 6, and 7, which I think to be radical difficulties, going to the very root of the structure.

No. 1: That the pawl and ratchet mechanism is inoperative. This depends upon the fact that the arms $k^5$ and $k^6$ cannot rise high enough, nor drop low enough, to make the pawl take more than two teeth on the ratchet, and pull down more than two, so producing less than a quarter circle of revolution. No one shows how this can be remedied. Moreover, the lever, $e^5$, is forced into the notch $G$ of the back of the paste plate by a spring, $e^8$, without which it would never lock the plate, since its heavier end is on the far side of the pivot, $e^4$. The temporary release of the plate by the contact of the end, $e^6$, with the cam, $e^7$, will not answer, because on the return movement the spring, $e^8$, will at once cause the lever again to lock the plate as soon as the cam, $e^7$, ceases to contact. That will be before the pawl has begun to pull upon the ratchet, for the cam will lose contact as soon as the L-piece, $b^8$, has descended the length of the slot, $b^9$, and the large number $B$ must descend still further than that before the arm, $k^6$, begins to pull down the lever, $f^4$, which operates the pawl, if it could do so at all. Moreover, at that period in the operation of the machine, when the

pawl could so operate, the plates are already in contact with the book. The experts say they can see no way to remedy this, and no way is suggested.

No. 4: That the machine can never unlock the plates. This is really another form of the objection No. 7. It also depends in part upon the fact that the bent ends of the treadle $N$ cannot operate to raise up the arms, $d$, $d$, high enough, because the bent ends strike on the sides of the frame.

No. 6: The slotted connection between $b^8$ and $O$ is inoperative. This is said to be an unworkable device mechanically; it will jam if one tries to operate it, and it is fundamentally vicious. No one suggests that it could be changed. Obviously there must be a portion of the rise in the book, represented by the slot, $b^9$, during which the plates so remain in contact with the sheets that a solid piece at that point would not serve. How to remedy this does not appear.

No. 7: The ends, $D$, $D$, of the arms, $d$, $d$, must enter the paste tank to give the slides $d^7$, their necessary movement. This is obviously true from the diagram. It is answered that the pot might be divided; but, if so, the paste plates could not close on the book. No other suggestion is made as to how this could be remedied.

[4] It must therefore be conceded, and indeed it is not denied, except as I shall show later, that the machine as disclosed was an inoperable mechanism. However, the defendant must go further, and show that it could not be made operable by a skilled mechanic. This it does by the testimony of its two experts, who say that they do not see how it could be made to operate. Now, it was made to operate when the principle was put into the second machine patented by the inventor here, 677,040. This machine was without question an entirely workable machine, and I do not attach any importance to the fact that in the operation of it, as seen by the defendant's witnesses, the leaves were not properly covered with paste. The testimony of the two mechanics who operated it for a period of over a year satisfies me beyond doubt that it was an entirely operable device, and had it been disclosed in the first patent I should not have hesitated to overrule the defence. When, however, one comes to examine the second machine, one sees that, although the principle of the first, as set forth in claim 6, is undoubtedly there, the disclosure is very radically different.

As these two machines are the only ones, besides the defendant's, which have ever appeared in which the claim has been embodied, and as the evidence nowhere suggests that there is another way in which it could be embodied and the unworkable features of the first eliminated, I think the question must resolve itself into this: Whether a skilled mechanic could have devised the second machine from what he saw of the first. A judge is entirely unadapted to decide such a question as an original question, and must rely upon the testimony of skilled artisans or of experts in mechanics.

Here the only evidence is that a skilled artisan could not have done so. I cannot accept Gunz's testimony in rebuttal as raising an issue in this respect. The codefendant's witnesses at great length pointed out the difficulties, and showed that the machine as disclosed was thorough-

ly unworkable. It was not enough for Gunz to say merely that he disagreed with them in their subsequent conclusion that it could not be made workable. I agree that the burden of proof on the issue is on the defendant; but the defendant had made out a case, and the complainant had the burden of going forward with the proof to show how a skilled artisan could change it over. I must conclude that he would not venture to show in detail how the difficulties could be remedied.

[5] Moreover, although it might by another be argued that such changes as were necessary to convert the first machine into the second were obvious to a skilled mechanic, certainly the complainant here cannot claim any such thing. Upon taking out the second patent, the inventor necessarily took the position that the second disclosure showed invention over the first, and it is precisely the negative of that position, which he must now assume to hold that the disclosure of the first was an adequate revelation to anyone wishing to construct the second. He cannot, therefore, rely upon the second machine as an obvious alternative of the first.

[6] Some question is made that the first machine was in fact operable and did the work of "casing." This testimony was, of course, of the greatest consequence to the case; but, in view of the very clear and unanswered testimony of the defendant's experts, I should be disposed to scrutinize it carefully. It seems pretty clear that the machine could not have worked; what, then, is the evidence that it did? I think this testimony is best approached from that of the two workmen in Little's establishment, and I cannot have the least doubt that the machine they used was the second.

Absolutely conclusive appears to me to be their testimony, when they saw the diagrams of the second machine. I know that they were not skilled in the use of diagrams, but that makes their recognition of such details as the intermittent rotating device for the paste plates especially significant. The description, "a sort of a piece of iron sticking out from both sides which went into a socket like," is the sort of description that a layman would give of the second machine, but never of the first. Again Rees and Recame's recognition of the arms $C^5$ is almost inconvertible evidence that the second machine is what they used, for the arms are quite unlike the plate-tipping arms of the first machine. Although Recame says that the first of the two machines used at Little's was not in use while he was there, yet he recognizes the second patent as describing that machine.

Now, George H. McClellan, who was the foreman at Little's says that five machines were sold, and that only one went to Little's. This one, "as nearly as I can recollect," was built in 1899, was installed in "the early part of 1900"; but later, when recalled, he said it was put in "about the latter end of 1900, or the first part of 1901," but he does not say how it worked, nor under which patent it was made. Certainly, so far as this evidence goes, it shows that, whether or not two machines were sent there, those that were sent were made under the second patent. Jackson McClellan to a certain extent corroborates their testimo-

ny for he says that there were two machines sent to Little's, which differed only in the "running gear, cams," etc.

I am satisfied from all this testimony that both machines were made under the second patent, which was applied for in June, 1900, and that the only evidence of any use of a machine under the first patent is that of Jackson McClellan himself as to the use made of the so-called "model" machine. It becomes necessary, therefore, to consider his testimony. He says that he actually cased in books with the model machine which he made and from which the drawings of the first patent were taken. From that model machine Hindle made the first of the five machines that were ever made at all, and it differed from the model only in running gear. Now, as I have shown, the first of Hindle's five machines was that sent to Little early in 1901 or late in 1900. It is therefore a fair conclusion that the model Jackson McClellan speaks of was similar to the Little machine which Recame identifies as made under the second patent.

Moreover, since Jackson McClellan says that the two Little machines were alike, except in "running gear, cams," etc., Ree's testimony corroborates Recame's that the model machine was under the second patent, in spite of Jackson McClellan's testimony to the contrary. In addition, it is quite clear that Jackson McClellan was confused in his recollection of the two patents, because he says that in each the paste plates get a half turn, which is concededly not the case. His recollection is also at fault in thinking that either of the patents shows any beveling of the paste plates at the edges.

Considering this confused and uncertain testimony of Jackson McClellan, which is certainly inconsistent with itself and with the testimony of the other witnesses, and considering the failure to call Hindle or to explain his absence, I cannot think that the complainant has met the proof of the defendant, and I conclude as a fact that the disclosure was not of an operable device.

[7] There is an insinuation that the Smyth Company had taken the idea, and by its greater ingenuity and resources made it profitable, stealing the inventor's germinative conception. That is, however, not the fact, I believe. The interview, which came out in rebuttal, between Fuller and McKibbin, was probably in the summer of 1900. Now, the Smyth Company began the construction of its first machine "about the latter part of the year 1899," and certainly before it knew of the patent in suit. That machine embodied as much of the idea of the patent as any other. The complainant's invention, even in its second form, never proved to be of any value as he disclosed it. That is perhaps of no consequence, if others took his idea and by improvements got the harvest which he had sown; but there is no evidence that they did do so. Each apparently independently saw that to raise a book up and down while paste was applied might be a good way to supply the place of hand labor, but that idea was of no value till it was accompanied by a practicable disclosure of how to do what was conceived.

It is quite too much to claim for a new invention that it is a pioneer merely because a new theory is adopted. Surely every one is familiar

with many ardent theorists, whose ideas are original and might be useful in the abstract, but whose actual contribution to the arts is nothing whatever. That man wins who first can present the idea in some form that can work.

Bill dismissed, with costs.

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes