## NELSON et al. v. CAMPBELL.
### Patent Appeal No. 3855.

Court of Customs and Patent Appeals.

Dec. 6, 1937.

George A. Brace, of Washington, D. C., Harry S. Demaree, of Chicago, Ill., and Elmer Stewart, of Washington, D. C. (Wallace R. Lane, of Chicago, Ill., of counsel), for appellants.

Frank H. Marks, of Chicago, Ill. (Ivan P. Tashof, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellee.

The interference is between appellants' application No. 529,616, filed April 13, 1931, and appellee's application No. 394,011, filed September 20, 1929.

The subject matter in issue, as defined in the counts in the interference, Nos. 1 to 4, inclusive, comprises a method and an apparatus for absorbing and cooling the absorbing liquid in a continuous absorption refrigerating apparatus, and an absorber in combination with an evaporator for such refrigerating apparatus.

Counts 1, 3, and 4 are illustrative. They read:

"1. In absorption refrigerating apparatus, an absorber comprising a main vessel, means for conveying refrigerant gas to be absorbed to said vessel, means for bringing absorption liquid into contact with said gas at a plurality of successive stages and means for conveying said liquid to points outside of said vessel in between the stages and there cooling the same."

"3. The method of causing the absorption of a gas, as a refrigerant gas, in a liquid which includes the steps of successively bringing the liquid into contact with the gas to cause the liquid to absorb some of the gas to form a solution, conveying the solution into heat exchange relation with a cooling medium and again bringing it into contact with the gas to form a stronger solution while preventing the stronger solution from mixing with the first formed solution.

"4. In absorption refrigerating apparatus the combination of an evaporator wherein a refrigerant may evaporate in the presence of an inert gas, an absorber, means for circulating the inert gas between the evaporator and absorber to convey the refrigerant gas from the evaporator to the absorber, means for bringing absorption liquid into contact with the gases in the absorber and means for conveying the liquid out of the presence of the gases in the absorber, cooling it and again bringing it into the presence of the gases in the absorber."

It is unnecessary for the purpose of this opinion to explain in detail the operation of a continuous refrigerating apparatus. It is sufficient to say that in such an apparatus ammonia is used as the refrigerant and water as the absorbent. Ammonia gas, produced by subjecting commercial aqua ammonia to heat in a boiler, passes to a con-

denser where it is condensed. The condensate then passes to an evaporator where it evaporates and produces refrigeration. In the operation of a refrigerating apparatus of this type, the absorption solution from which ammonia gas has been expelled is conveyed to an absorber where the ammonia coming from the evaporator in a gaseous state is reabsorbed and the solution returned to the boiler to be reheated, the ammonia gas again expelled and the process continued. In the absorption of ammonia gas in the absorber, the absorption solution becomes heated and, in order that there may be sufficient and continued absorption, it is necessary that the heat be adequately dissipated. Moreover, in a refrigerating apparatus of this type, there is a direct relation between the proper functioning of the absorber and the refrigerating capacity of the machine.

In the prior art, according to appellants' application, "The means commonly employed for facilitating the dissipation of heat from these devices [condenser and absorber] has consisted of cooling water pipes passing through them, cooling water jackets around them or where air cooling has been used, radiating fins or the like for providing an extended surface."

The process here involved, as stated in substance in count 3, is the successive bringing of the absorbent solution into contact with the ammonia gas in the absorber and a cooling medium, and the prevention of the mixing of the weaker and the stronger solution.

In order to carry out the involved process, a plurality of cooling coils, placed near and in connection with the main body of the absorber, are exposed to the free circulation of air (no other cooling medium being used), and they and the main body of the absorber are so designed, arranged, and connected that when the refrigerating apparatus is being operated the absorbing solution is caused to circulate through the main body of the absorber (where it comes in contact with the ammonia gas), the cooling coils, and back into the main body of the absorber.

For the purpose of this decision, and for reasons which need not here be stated, it is conceded by his counsel that appellee is restricted to his filing date—September 20, 1929—for conception of the invention and its reduction to practice, and that appellants have established conception of the invention prior to appellee's filing date.

Appellants introduced in evidence Exhibits Nos. 1, 2, 3, 4, 5, 6, 7, 8, and 9. As, Exhibits Nos. 1, 2, and 3 are important only as they concern appellants' conception of the invention, they need not be discussed here.

Exhibit No. 4, dated October 15, 1928, is a drawing of an absorber, as defined in the involved counts.

Exhibit No. 5, dated December 11, 1928, is a detailed drawing showing the various elements of an absorption refrigerating system, including an absorber and an evaporator.

Exhibit No. 6, dated February 18, 1929, is a drawing disclosing, in diagrammatic form, a complete refrigerating system.

Exhibits Nos. 7 and 8 are photographs showing the front and rear views, respectively, of a refrigerating apparatus, claimed to have been assembled in January, 1929, and operated in January or February of that year.

Exhibit No. 9 is an absorber with interstage cooling coils, claimed to have been constructed in conformity with Exhibit No. 4.

It is claimed by counsel for appellants that an absorption refrigerating apparatus, made from the drawings, Exhibits Nos. 4 and 5, including the absorber, Exhibit No. 9, and an evaporator, was completed in January, 1929, and operated in either January or February of that year; that the construction and operation of that device constitutes a reduction to practice of the involved invention; that appellants conceived and reduced the invention to practice prior to appellee's filing date, September 20, 1929; and that, therefore, appellants are entitled to an award of priority.

The sole issue requiring our consideration is whether or not appellants have established that they reduced the invention to practice in January or February, 1929.

Appellants, Nelson and Nesselmann, were joint inventors, and they and all of their witnesses were employees of the Hoover Company of Canton, Ohio, in whose plant all of the activities of appellants and their witnesses relative to the alleged reduction to practice of the involved invention took place.

Nesselmann was in Germany at the time of the taking of the testimony in this case, and therefore did not testify.

Nelson, a research engineer employed by the Hoover Company, testified that a com-

plete refrigerating apparatus in which the absorber, Exhibit No. 9, was incorporated, was completely assembled in January, 1929, and operated on or about February 1–4 of that year. He described the operation of the device and the functions of its various elements. We quote from his testimony relative to the operation:

"Q. 139. Did ammonia evaporate in the evaporator? A. Yes.

"Q. 140. Was ammonia absorbed by the water in the absorber? A. Yes.

"Q. 141. Was heat discharged in the coils below the absorber? A. Yes.

"Q. 142. Was inert gas, hydrogen, did you say circulated between the evaporator and the absorber? A. Yes."

He further stated that the absorber, Exhibit No. 9, was removed from the refrigerating apparatus after the test in February, 1929, and, when asked why it was removed, said: "In order to avoid construction of other apparatus we removed the absorber so that we could conduct other tests and experiments that were of interest to us." He was not asked, and did not state, anything relative to the extent of the ammonia evaporation in the evaporator, or the extent of the absorption of the ammonia gas in the absorber. Neither did he state anything relative to the extent of heat discharged in the cooling coils of the absorber. He did not testify that the refrigerating apparatus was operated a sufficient length of time to properly test it, nor did he express an opinion as to whether it had operated successfully.

Appellants' witness Walter C. Davidson, also a research engineer employed by the Hoover Company, testified as to his familiarity with appellants' exhibits, explained the operation of an absorber as disclosed in the drawings, Exhibits Nos. 4 and 5, and stated that the absorber, Exhibit 9, was installed in a refrigerating apparatus in January, 1929; that he saw the apparatus being constructed some time during that month; that he was present and observed the apparatus in operation during that same month, and, with reference to the operation of the apparatus, testified as follows:

"Q. 88. Did absorption take place in the absorber of this apparatus? A. It did.

"Q. 89. How did you know that? A. By the heating up of the vessel.

"Q. 90. How could you tell the vessel heated up? A. By placing the hand on the conduits.

"Q. 91. Which conduits are you referring to, referring to Exhibit 5? A. The conduits leading to the absorber and on the fin portion of the condenser which are located below the absorber as well as upon the vessel itself. * * *

"Q. 95. Did you examine the apparatus while it was being tested? A. I did.

"Q. 96. How did you examine it? A. By feeling the various vessels.'

"Q. 97. When you felt of these vessels how did you tell their condition? A. By comparing it with the surrounding temperatures. For instance, the atmosphere temperature.

"Q. 98. Did the pipes feel warm or cold? A. Well, in the evaporator it was cold and in the absorber the conduits leading from the absorber were warm and that indicated that absorption was taking place.

"Q. 99. What physical action in the absorber would cause it to feel warm? A. The absorption of ammonia; when ammonia is absorbed in water or a weaker solution the heat is liberated.

"Q. 100. Would that also cause a rise in temperature? A. It would.

"Q. 101. Or cause it to feel warm? A. Yes, it would cause it to feel warm."

The witness stated that he fixed the time of the construction and operation of the apparatus from the dates on the drawings, Exhibits Nos. 4 and 5; that, at the time of the operation of the apparatus, it was not inclosed in a refrigerating box; that the absorber, Exhibit No. 9, was removed from the refrigerating apparatus within a month or two after its operation in January, 1929; that the absorber remained in the storeroom of the Hoover Company, located in the refrigeration laboratory, for some time, and later was removed to the models and samples vault, where it had remained until the taking of the testimony in this case. He stated that the absorber was removed so that further work might be done on the refrigerating apparatus. On cross-examination, the witness stated that no records were kept of the tests made during the operation of the apparatus, and, in explanation of the failure to make and keep any notes of such tests, said: "No, there was no record kept. We had made up our minds that we wanted a large capacity machine and inasmuch as the capacity was not quite as large as we had desired, we didn't think at that time to keep test records. In other words we

were after results and wanted them quick." With reference to the functioning of the absorber and the evaporator, he testified as follows:

"A. The only way we had of knowing that was by feeling the various conduits. We had become, around the laboratory, so that we could tell when certain parts of the machine were functioning and when they were not functioning, just by the feel.

"X–Q. 143. Then you depend on the feel of the machine to indicate to you the peculiar functioning of this machine. Is that correct? A. That is correct.

"X–Q. 144. And you would know from that just when the weak liquor was absorbing the gas and when it was taking place? A. I did.

"X–Q. 145. Do you know what the efficiency test of the machine was? A. I don't know what its thermo-efficiency was.

"X–Q. 146. *Then you don't know whether it was a really successful test or not?* A. *I know we had refrigeration because the evaporator, the part which is supposed to get cold, was colder than the surrounding room temperature.*

"X–Q. 147. Do you know why the machine was torn down after it was put on test? A. In the first place we tore the machine down to see whether or not it *would be possible to obtain still more refrigeration. It was our first welding job that we ever did and we rather suspected that some of the welds had partly closed on us.*

"X–Q. 148. Did that prove true? A. We didn't carry it to a completion. We didn't tear the apparatus apart to find out.

"X–Q. 149. Did they actually do any further construction of the machine after that. A. They did. The machine was put into very excellent operation afterwards.

"X–Q. 150. At about what date, do you know? A. I would say within a couple months.

"X–Q. 151. Which would bring the date to about what? A. Perhaps March or April, 1929.

"X–Q. 152. But you don't know whether it was March or April? A. No." (Italics ours.)

(It may be said that there is no other evidence of record tending to establish that the apparatus was put into "very excellent operation" either in March or April, 1929, or at any other time.) With reference to the construction of the absorber, Exhibit No. 9, the witness stated that it was constructed in accordance with the drawing, Exhibit No. 4, "as near as the mechanics could hold the dimensions, welding and construction."

The witness Donald G. Smellie, chief engineer in the employ of the Hoover Company, testifying for appellants, stated that he was familiar with the drawings, Exhibits Nos. 4 and 5, and the absorber, Exhibit No. 9, which, he said, was constructed, so far as he knew, "within the usual limits of experimental work" in accordance with Exhibit No. 4. With reference to the involved invention he said that "One of the limits governing the capacity of an absorption refrigerating machine is the ability of the absorber to carry out its intended function. The limiting feature in this respect and especially in an air cooled machine is the ability to secure adequate dissipation of the heat of absorption. The object of this invention was to provide auxiliary radiating capacity by removing the solution from the absorber, passing it through external air cooled coolers, bringing it back into the presence of the gas to be absorbed and repeating this in a series of steps." He was not interrogated relative to the operation of the device.

Appellants' witness W. G. Kilpatrick, assistant chief inspector in the employ of the Hoover Company, stated that he saw a refrigerating apparatus in which the absorber, Exhibit No. 9, was incorporated in operation, either in the latter part of 1928 or early in 1929. With reference to the operation of the apparatus, he testified:

"Q. 25. *Was it producing refrigeration?* A. *It was producing cold.*

"Q. 26. How did you know this? A. By feeling it and also evidence of frost." (Italics ours.)

When asked on cross-examination whether the apparatus he saw in operation was successfully operated, he said: "I know that it showed refrigeration."

The witness further stated that the absorber, Exhibit No. 9, was removed from the refrigerating apparatus, and that work was continued on the apparatus and on the absorber, but that there was no change in the construction of the absorber, except possibly that a frame may have been constructed to hold it. We quote further from his testimony on cross-examination:

"X-Q. 6. About, approximately, how many models did you make of that refrigerator in which an absorber more or less simulating the drawings was involved. Do you know, just roughly? A. On this particular refrigerating apparatus I think that we are down to the letter M, N or O, and when we took the absorber off the model number on this apparatus was changed to Model 45005A or B and then to avoid confusion we gave that a separate model number for convenience and designation only.

"Q. 7. You say there were approximately 14 or 15 models made. Is that correct? A. Changes, yes."

On this record the tribunals of the Patent Office concurred in holding that appellants had failed to establish that the apparatus claimed to have been operated in January or February, 1929, was a success, and that therefore appellants had failed to establish a successful reduction to practice prior to appellee's filing date.

The question of appellants' diligence is not involved, as there is no evidence relative to their activities immediately prior to the filing of appellee's application.

It is contended by counsel for appellants that, as all of the parts of the refrigerating apparatus, except the absorber, were old, the simple test of feeling the cooling coils and the main body of the absorber to determine that they and, therefore, the absorbing liquid, were warmer than the room temperature, and the feeling of the evaporator to determine that it was colder than the room temperature, as stated by appellants' witnesses, was sufficient to establish that the absorber and the refrigerating apparatus in which it was incorporated had utility and was successfully operated, and that such operation amounted to a successful reduction of the invention to practice.

Many cases are cited by counsel for appellants in support of the proposition, with which (proposition) we are in agreement, that, in reducing an invention to practice, it is unnecessary to show that the device is commercially successful, and that it is sufficient "if it actually and mechanically performs, though only in a crude way, *the important function by which it makes the substantial change claimed for it in the art,*" as stated by the Supreme Court in the case of Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112. (Italics ours.)

Assuming, therefore, for the purpose of this decision, that a refrigerating apparatus in which the absorber, Exhibit No. 9, was incorporated was operated in January or February, 1929, the question to be determined is whether the evidence is sufficient to establish that the absorber actually and mechanically performed the important functions for which it was designed; that is, was the heat generated in the absorber adequately dissipated so that there might be adequate and continued absorption, thus giving the refrigerating apparatus adequate refrigerating capacity? That, according to the record, was the problem confronting appellants at the time of the operation of the refrigerating apparatus.

Whether the apparatus was operated for a sufficient length of time to ascertain that the dissipation of heat from the absorber was adequate for continued reabsorption of the gases, and that continued and adequate refrigeration took place, would seem to be one of the questions that ought to be answered by the testimony in the case. Yet, there is no evidence on that subject.

There is nothing in the record to show the extent of evaporation in the evaporator; nothing to show the extent of the dissipation of heat from the absorber. None of appellants' witnesses testified that the apparatus operated successfully, and when, on cross-examination as herinbefore noted, the question was put directly to the witness Davidson as to whether he thought the test was really successful, he said that he knew there was *refrigeration,* because the evaporator was colder than the room temperature, which temperature was not stated. A similar question was put to the witness Kilpatrick on cross-examination, and he said that he knew that the apparatus showed refrigeration. What the extent of the refrigeration was he did not say.

We think it is a fair observation to make that, if appellants' witnesses had actually thought that the tests made in January or February, 1929, were successful, they would have so stated. Furthermore, it is clear from the record that appellants and their witnesses were not satisfied with the operation of the apparatus. The absorber was almost immediately removed and further work was performed on the refrigerating apparatus, and approximately 14 or 15 changes were made therein. What those changes were, is not stated.

In view of the fact that the absorber, Exhibit No. 9, was thereafter stored until the taking of the testimony in this case,

it evidently was never used again in a refrigerating apparatus. Furthermore, the witness Davidson stated that the reason no records were made and kept of the January or February, 1929, tests, was because they wanted a large capacity machine, and the one they were operating did not have the *desired capacity*.

It may be further observed that it was more than two years after the tests made in January or February, 1929, before appellants filed their involved application for a patent.

In view of all the facts and circumstances of record, we must hold that appellants wholly failed to establish a successful reduction to practice of the involved invention.

The decision of the Board of Appeals is affirmed.

Affirmed.