37 C.C.P.A.(Patents)

### FIELD v. KNOWLES.

### FIELD et al. v. KNOWLES.

Patent Appeals Nos. 5692, 5693.

United States Court of Customs and Patent Appeals.

Argued March 13, 1950.

Decided June 30, 1950.

---

7. See United States v. Adams, 1868, 7 Wall. 463, 74 U.S. 463, 19 L.Ed. 249.

Curtis, Morris & Safford, New York City, Cameron, Kerkam & Sutton, and Ralph H. Hudson, Washington, D. C., (Loyd H. Sutton, Washington, D. C., Edward G. Curtis, and Charles C. Ladd, New York City, of counsel), for appellants.

Paul Bliven, Seattle, Wash. (Richard R. Trexler, Chicago, Ill., and Charles L. Stur-

tevant, Washington, D. C., of counsel) for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Judges.

JOHNSON, Judge.

On August 28, 1942, an interference, No. 80,398 was declared by the Primary Examiner in the United States Patent Office between the patent applications of Crosby Field, No. 352,709, filed August 15, 1940, and Frank W. Knowles, No. 262,869, filed March 20, 1939. The single count of the interference related to Field's claim 41 and Knowles's claim 50 which the parties had added to their applications at the suggestion of the examiner for interference purposes. On February 12, 1943, Knowles moved to dissolve the interference alleging inoperativeness of the Field device. Additionally, Knowles considered the count broader than his invention, and did not believe Field could make a claim reciting a limitation, not present in the count, which Knowles believed essential to operativeness; as a consequence of which Knowles was "cancelling the claim" from his application, and moved for dissolution of the interference, stating that his action was not a concession of priority to Field as to their respective materials. Field's assignee on February 27, 1943, moved to amend the issue in Interference No. 80,398 by adding counts drawn from Field's applications Nos. 352,707, 352,708, and a joint application of Field and Stover, No. 352,710, as well as moving to dissolve the interference on the ground that Knowles's disclosure was inoperative. On September 21, 1943, the Primary Examiner ruled on the motions of the parties, denying the respective motions to dissolve, and granting the motion of Field's assignee to bring into the interference the additional applications of Field and Field and Stover as to certain of the proposed counts. On November 17, 1943, the Primary Examiner added to Interference No. 80,398 the Field applications Nos. 352,707 and 352,708. Field thus had three

596

applications in interference with the Knowles application with the relationship of the interference counts and claims of the applications being as follows:

| Counts | Field Case A (352,709) | Field Case B (352,708) | Field Case B (352,707) | Knowles (262,869) |
|---|---|---|---|---|
| 1 | 41 | | | 50 |
| 2 | | 22 | | 51 |
| 3 | | | 38 | 52 |

Also on November 17, 1943, the Primary Examiner declared Interference No. 21,217 to exist between the Field and Stover application No. 352,710 and the before-mentioned Knowles application No. 262,869, the relationship of counts and claims being as follows:

| Counts | Field et al. | Knowles |
|---|---|---|
| 1 | 29 | 37 |
| 2 | 31 | 48 |
| 3 | 32 | 43 |

Both parties took testimony, each incorporating into a single record the evidence relied upon for both interferences. The cases came on for hearing before the Board of Interference Examiners in the U. S. Patent Office, which rendered its separate decisions on May 28, 1948, awarding in Interference No. 80,398 priority of invention as to count 1 to Field, and as to counts 2 and 3 to Knowles. Priority of invention as to all counts in Interference No. 81,217 was awarded to Knowles. Knowles entered no appeal as to the adverse ruling on count 1 in Interference No. 80,398. Field has appealed from the board's decision in Interference No. 80,398, noting 47 assignments of error, while Field and Stover have appealed from the decision in Interference No. 81,217, bringing 35 assignments of error in that case before us.

 The appellants' applications in interference were filed August 15, 1940. The appellee's application was filed March 20, 1939. Appellee having filed his application first, the presumption arises that he is the first inventor, Gallagher v. Hien, 25 App. D.C. 77, 68 L.R.A. 272, and the burden is thus on the appellants as junior parties to establish priority of invention by a preponderance of the evidence, Anderson v. Walch, 152 F.2d 975, 33 C.C.P.A., Patents, 774.

Interference No. 80,398, P.A. 5692.

As will appear from the counts, the subject matter involved is refrigerating apparatus wherein liquid frozen on the surface of a flexible metal belt passing over a refrigerated surface is removed therefrom by a flexing of the belt by means provided therefor in the apparatus.

The counts of Interference No. 80,398 read as follows:

"1. An ice making apparatus comprising an evaporator forming part of a closed refrigerating system and having a refrigerating surface of constant curvature; an endless flexible belt of heat conducting material; means maintaining a portion of said belt in close proximity to a major portion of said refrigerating surface and causing said portion of the belt to conform in curvature to said surface, said means including an element spaced from said refrigerating surface and presenting a curved surface in contact with the inner surface of the belt; and means for applying water to be frozen to the exterior of the belt; said belt being movable relative to said surfaces and said apparatus being constructed and arranged to hold a quantity of liquid having a freezing point below the lowest temperature to be reached by the operation of said apparatus and to cause the relative movement of the belt with respect to the refrigerating

surface to interpose a portion of said liquid in the form of a film between the latter and the portion of the belt conforming thereto in curvature and to flex the belt across the second mentioned curved surface to break a layer of ice frozen thereto.

"2. In refrigerating apparatus, in combination an evaporator having a continuous curved refrigerated surface, an endless flexible belt encompassing said refrigerated surface and contacting a portion thereof, means closing the open sides of said endless belt, deflector means adapted to flex successive sections of said belt out of contact with said evaporator, and a liquid positioned between said belt and said refrigerated surface adapted to keep wet the contacting surfaces thereof.

"3. In refrigerating apparatus, in combination, a framework, a refrigerated member mounted on said framework and having a rigid convexly curved refrigerated surface, and endless flexible metal belt encompassing said refrigerated member and having a greater periphery than said member, means for tensioning said belt against said convexly curved refrigerated surface, means for imparting relative movement between said belt and said surface, and sealing means including an apron extending from said belt and including means extending from said framework, said apron and last-named means coacting to seal the space between said belt and said refrigerated surface from the atmosphere."

Count 1 requires an apparatus with a curved evaporator with refrigerated surface; an endless, flexible, movable belt held against that surface by means of a roller urged against the inner surface of the belt, flexing the belt; means for supplying water to be frozen to the belt; and anti-freeze liquid between the belt and evaporator. Count 2 adds means for closing the open sides of the belt. The belt is not required to be movable with relation to the evaporator. Count 3 requires the end closure means to include an apron extending from the belt coacting with the closure means to perfect the seal.

In Field case A (352,709) the metal belt travels over two spaced pulleys and slides over the convex curved surface of a stationary evaporator. Between the evaporator and the belt, an anti-freeze fluid augments the heat transfer relationship between the evaporator and belt as well as diminishes the sliding friction between the surfaces. Liquid to be frozen is spread upon the moving belt as it slides over the evaporator. As the belt passes around the end pulley, the ice is peeled off as the belt makes the sharp turn around the pulley.

In Field case B (352,708) the evaporator is cylindrical. The metal belt passes around the cylinder and is held in contact with a greater portion of its circumferential surface area by means of twin rollers spaced apart from the cylinder and positioned within the encompassing belt so as to contact its inner surface at each end. The rollers are urged against the under surface of the belt at its ends, tensioning the belt around the cylinder. The rollers are mounted on supporting arms keyed to a hub at each side of the drum. These deflector rollers revolve about the axis of the shaft mounting the hubs of their supporting arms, moving first in one direction, then in the opposite direction. The surface of the belt under which the rollers pass is flexed, dislodging the ice which has frozen there. Anti-freeze fluid is introduced between the belt and the cylinder to improve the heat transfer relationship and to lubricate those surfaces. Rubber aprons are attached to the edges of the endless belt and affixed to end panels, thereby sealing the space within the inner surface of the belt as it encompasses the cylinder and the moving spaced rollers from the atmosphere. The belt does not revolve about the cylinder, but portions of the belt surface are flexed and lifted away from the drum surface as the roller arms swing back and forth.

In Field case C (352,707) the belt is pulled over a pair of convexly curved evaporators. These evaporators are mounted in upper and lower relationship, their convex surfaces facing outwardly, and with end pulleys so spaced that the tensioned belt is held in heat transfer relationship against the evaporators. The belt itself is constructed of endless metal panels joined to form a belt by means of rubber strips

connecting adjacent edge portions of the panels. These rubber strips extend inwardly into a space provided between evaporator segments. The end pulleys or rollers are built up with spaced rubber bands so that the inwardly projecting rubber strips of the belt ride between them. The metal panel portions of the belt ride against these rubber bands, so that the composite metal belt is tensioned resiliently by the rollers. The metal panel portions of the belt lie in heat transfer relationship against the evaporator segments. Aprons are attached to the outer edges of the composite belt. They extend outwardly to form a connection with end plates in staggered relationship which enclose the ends of the apparatus. A metal band extends around each apron so as to hold it in contact with the end plates. The apron is grooved so as to receive the edges of the end plates. As the belt moves, the aprons slide over the end plate assemblies, sealing off the interior of the apparatus from the atmosphere. Nozzles are positioned in the apparatus above the upper evaporator surface and below the lower evaporator. The liquid to be frozen is sprayed onto the belt as it slides over the evaporators. Ice forms and is peeled off of the belt as it bends when passing over the end pulleys.

The Knowles device comprises a closed revolvable metallic drum into which refrigerant is fed and removed; an endless metal belt placed around the drum in contact with it; a roll positioned a short distance from the surface of the drum, the belt passing over the roll and being held against the greater surface of the drum by the tension received from the roll riding against its inner surface; an additional roll which rides above the first roll but against the outside surface of the belt at the point where the belt urged outward by the inner roller leaves the drum. In this device, the belt lying against the greater part of the drum's surface in heat transfer relationship is turned by friction as the drum revolves. The belt, according to the Knowles application, is made to "track" by "crowning" the drum, roll, or both; by "placing a straight sided bead on the edge of the drum along the edge of the belt,"

or by "securing to the underside of the belt adjacent to the drum V-shaped guides." Anti-freeze liquid is used between the drum and the belt. Rubber skirts are attached to the edges of the belt and connect to end closure plates sleeved upon the shaft or journal arrangement around which the drum revolves. As the belt revolves, the rubber skirts attached thereto cause the end plates to which they are attached to revolve, effecting a seal of the interior of the apparatus from the atmosphere. Below the drum is a pan filled with water. The drum is positioned so that its lower portion is immersed in the water. As the drum revolves, water adheres to the surface of the belt, freezes upon the belt as it passes over the top of the drum, and the ice is flexed off the belt as it passes under the outside or "breaking" roll and over the inner, outwardly-urging roll. Other arrangements are described, one in which there is no roller within the belt, but three rollers riding against the outside surface of the belt; one of which is power driven so as to cause the belt to arc outwardly between the driving roll and a "breaking" or "anchor" roll; another embodiment has a roll spaced apart from the drum and pressing against the inner surface of the belt while two rolls ride against the outer surface of the belt pressing it against the drum at the points where the belt leaves the drum to pass around the tension roll and return to the drum after passing over the tension roll. In each embodiment, means are set forth to seal the interior of the apparatus from the atmosphere.

■ In his preliminary statement, Knowles alleged conception and disclosure to others of the subject matter of the counts in June 1938, and reduction to practice in September 1938. The Knowles application, No. 262,869, was filed March 20, 1939. The board held that the proofs failed to show the operation of a machine satisfying the counts prior to November, 1938; that no machine was built, tested, or conceived which had promise of "belt durability," (characterized by the board as a *sine qua non* of utility for ice-making machines of this type) prior to Knowles's filing date; that Knowles had accordingly

failed to establish conception or reduction to practice prior to that date, March 20, 1939; that while the Knowles machine was not operable to the extent required to show practical utility, his disclosure, as to counts 2 and 3, was nevertheless not inoperative. As to those counts Knowles was restricted to March 20, 1939. Because Knowles had urged that the original count, count 1, was broader than his invention, since he had found that to be operative the apparatus must be sealed off from the atmosphere, the board held that Knowles, having "admitted and urged" the inoperativeness of "his open machine," could not prevail as to count 1. Knowles's motion to dissolve had attacked the operativeness of Field's device, and Knowles renewed his contentions at the final hearing. The board held that the Field machine was operative "in the hands of a watchful expert in the art" but impractical in its intended field; that Field was therefore not entitled to a date for actual reduction to practice, but that his disclosure relating to count 1, Field application No. 352,709 (case A), filed August 15, 1940, was operative. Field was accordingly awarded priority as to count 1. Knowles did not appeal from that finding, and the contention raised in his brief before us that the case should be remanded to the Board of Interference Examiners "for clarification of their rulings in respect to" count 1 cannot be considered. Although Field in bringing this appeal before us assigned error to the board's findings touching count 1 that Field had not made an actual reduction to practice, Knowles is not thereby entitled to have considered here whether or not there was error in that part of the board's findings touching count 1 wherein the Knowles disclosure was held to be inoperative. Knowles had his right of appeal, and having waived it by inaction, he may not be heard to challenge the disputed findings now.

In his preliminary statement, Field alleged that the first drawing and written description of the subject matter of counts 2 and 3 were made February 12, 1938, with disclosure to others on February 14, 1938, and reduction to practice in the latter part of March 1938. The board awarded Field March 2, 1939, as the date of conception, but held that the invention had never been reduced to practice, and that Field had not exercised due diligence throughout the critical period just prior to Knowles's filing date down to Field's own filing date. Field, the junior party, was thus restricted to his filing date, August 15, 1940, for a constructive reduction to practice, and the board awarded priority of invention as to counts 2 and 3 to Knowles, the senior party, who had filed his application on March 20, 1939.

In his Notice of Appeal, Field set out 47 assignments of error (reasons of appeal) relating to the board's decision. Of those, assignments 1 to 14, inclusive, are directed to the board's decision touching upon count 1 and are concerned primarily with the board's holding that Field had not actually reduced his Type S machine, embodying the elements of count 1, to practice. Although that decision restricted Field to his filing date, August 15, 1940, it was sufficient to award him priority of invention over Knowles on the board's finding that the latter's disclosure was inoperative. Assignments 15 to 24, inclusive, are substantially concerned with the board's decision relating to counts 2 and 3 that although Knowles's machine was not sufficiently operable so as to justify a finding of actual reduction to practice, his disclosure was not inoperative and he was entitled to his filing date for conception and constructive reduction to practice. Assignments 25 to 32, inclusive, are directed to the board's conclusion of law that the operativeness of a disclosure in an application must be evaluated on a different basis than conception and actual reduction to practice. Under that view of the law, the board had held Knowles's disclosure operative so as to merit his filing date for conception and reduction to practice of the subject matter of counts 2 and 3, though his actual machine embodying the subject matter of those counts was held not to be of sufficient practical utility to merit a finding of actual reduction to practice. Assignments 33 to 46, inclusive, are directed to the board's findings that Field had not conceived the subject matter of counts 2 and 3 until March 2, 1939; that

he had not made an actual reduction to practice; that the machine Field relies on as an actual reduction to practice is an abandoned experiment; and that he was not reasonably diligent after a test in May 1939 until his filing date in August 1940. Assignment 47 is a general allegation that the board erred in awarding priority to Knowles as to counts 2 and 3.

The issues raised by the appellant's assignments of error will be considered in the following order:

I. As a matter of law, is there a different basis for evaluating the standard of operativeness required for a patent application disclosure to be considered operative, and the standard of operativeness required to establish that the disclosure of the application is actually reduced to practice?

II. Did the board err in holding that as to counts 2 and 3 the Knowles disclosure was not inoperative?

III. Did the board err in holding that Field had not established conception of the subject matter of counts 2 and 3 until March 1939; that he had not reduced the invention to practice; that his machine relied on for actual reduction to practice was an abandoned experiment; and that Field was not diligent from May 1939 to August 1940?

IV. Did the board err in holding that Field had not made an actual reduction to practice of the subject matter of count 1 prior to his filing date?

### I. The issue of law.

The disclosure of an application placed in interference by the Patent Office is presumed to be an operative disclosure, Mark v. Greenawalt, 32 App.D.C. 253, and will not be held to be inoperative unless it is established (by the junior party by a preponderance of the evidence, Trumbull et. al. v. Kirschbraun, 67 F.2d 974, 21 C.C.P.A., Patents, 758), that it can not be made to operate for any practical or useful purpose, Mark v. Greenawalt, supra, by such changes and alterations, short of invention, which one skilled in the art would be capable of applying in constructing the device with the disclosure of the specification and the drawings of the application as his guide.

Computing Scale Co. v. Standard Computing Scale Co., 6 Cir., 1912, 195 F. 508; Sun Ray Gas Corp. v. Bellows-Claude Neon Co., 6 Cir., 1931, 49 F.2d 886; Robbins v. Steinbart, 57 F.2d 378, 19 C.C.P.A., Patents, 1069; Trumbull et al. v. Kirschbraun, supra; Creed et al. v. Potts, 96 F.2d 317, 25 C.C.P.A., Patents, 1084. It is unnecessary to establish commercial utility providing the apparatus will operate in the manner described, Nelson v. Hainsworth, 149 F.2d 367, 32 C.C.P.A., Patents, 1025, though an otherwise operative machine has been held lacking in patentable utility where its use in industry would be prohibitive due to the limitations inherent in its nature, Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 1934, 71 F.2d 539, certiorari denied 293 U.S. 625, 55 S.Ct. 345, 79 L.Ed. 712; Cleveland Punch & Shear Works Co. v. E. W. Bliss Co., 6 Cir., 1944, 145 F.2d 991. The capacity to perform in the manner intended, though only in a crude way, is sufficient, Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112; Williams v. Handschiegl, 48 F.2d 395, 18 C.C.P.A., Patents, 1176. The junior party's burden of proof is often carried with evidence of *inter partes* tests performed of devices built according to the application disclosure, but apparent inoperativeness revealed by such tests may be held to be of little weight where it appears that the testers failed to utilize the skill of the art to rectify the difficulties whence stemmed inoperativeness. Krasnow et al. v. Bender, 170 F.2d 560, 36 C.C.P.A., Patents, 723. Failure of the junior party to build and conduct an *inter partes* test of his opponent's device may be fatal to his contention of its inoperativeness. Lavin v. Pierotti, 129 F.2d 883, 29 C.C.P.A., Patents, 1235.

Where either of the parties seeks to establish conception and reduction to practice prior to his filing date, the conception and disclosure to others required is the inventor's completed thought expressed in such clear terms as to enable those skilled in the art to which the invention pertains to make, compound, build, or practice the device, compound, apparatus, or process which constitutes the subject mat-

ter of the invention. Standard Cartridge Co. v. Peters Cartridge Co., 6 Cir., 1896, 77 F. 630, 647; Rowe v. Holtz, 55 F.2d 468, 19 C.C.P.A., Patents, 970. To constitute an actual reduction to practice of a machine, the device must be completed in an operative form capable of successfully demonstrating its practical utility in its intended field of use. Ocumpaugh v. Norton, 25 App.D.C. 90; Van Auken v. Cummings, 49 F.2d 490, 18 C.C.P.A., Patents, 1250. Unless the device is of such a nature that by its very simplicity its practical operativeness is manifest, Mason v. Hepburn, 13 App.D.C. 86, 89, the machine must be tested under actual working conditions, Smith v. Nevin, 73 F.2d 940, 22 C.C.P.A., Patents, 748, in such a way as to demonstrate its practical utility for its intended purpose, Sydeman v. Thoma, 32 App.D.C. 362, 373; Feldmeier et al. v. Mojonnier, 97 F.2d 124, 25 C.C.P.A., Patents, 1158, beyond probability of failure, Taylor v. Swingle, 136 F.2d 914, 30 C.C.P.A., Patents, 1219. Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful. Lavin v. Pierotti, supra; Steenstrup v. Heath, 95 F.2d 514, 517, 25 C.C.P.A., Patents, 981, 986; Van Auken v. Cummings, supra. Thus, in the case of an ice-making machine, it must appear from the tests relied upon to establish actual reduction to practice that the machine operated for a sufficient length of time to demonstrate continued and adequate production of ice, Nelson et al. v. Campbell, 92 F.2d 974, 978, 25 C.C.P.A., Patents, 749, 756, manifesting the practical utility of the machine for the field in which machines of that type are utilizable. If the volume of ice produced, the durability of the parts, or the expense of the machine and its operation are such as to militate against practical consideration of the machine as commercially useful, the burden of proving actual reduction to practice has not been carried. This is not to say that perfection for commercial use is required. Cf. Van Cleef v. Tierney, 118 F.2d 911, 28 C.C.P.A., Patents, 1039.

Conceivably, evidence brought forward by a senior party in an unsuccessful attempt to prove actual reduction to practice might be successfully relied on by the junior party in his attempt to overcome the presumption of operativeness attaching to the senior party's application disclosure. If that evidence were sufficient to establish in a clear and convincing manner that the senior party's device could not be made to operate even with such modification and alteration short of invention as would occur to and be made by a person skilled in the art genuinely interested in making the device operate, the junior party would be entitled to prevail. Manhatten Book Casing Mach. Co. v. E. C. Fuller Co., C.C.S.D. N.Y.1912, 274 F. 964, 967. On the other hand, it is possible that a senior party's evidence on the subject of actual reduction to practice would be insufficient to establish that fact and carry *his* burden of proof, while being equally insufficient to support the junior party's contention that the senior party's device is inoperative. We agree with the board that the alleged inoperativeness of the senior party's disclosure here must be evaluated on a basis different from conception and reduction to practice. See Mark v. Greenawalt, supra. A senior party might be unable to prove conception and actual reduction to practice due to his failure prior to his filing date to bring to an operative state a machine showing practical utility for its intended purpose, without justifying the conclusion that the junior party has carried his burden of proving by a preponderance of the evidence that the disclosure of the senior party's application could not be made to operate successfully under the application of the representative skill in the art.

## II. Alleged inoperativeness of Knowles's device

The board held that "a Knowles closed machine corresponding to his disclosure would operate for about a few days making ice and this, while not sufficient to show practical utility within the intended purpose, is * * * sufficient to hold that inoperativeness of the Knowles disclosure as to counts 2 and 3 is not proved." That

finding we think to be well supported by the testimony of the following witnesses:

Frank Knowles testified that a closed end machine (K-9) was completed circa November 1938 and operated making ice at the rate of 150 pounds of ice per hour "for several months continually"; that a machine, K-10, basically the same as K-9 but modified as to the idler roll, operated that same month producing ice at the rate of 150 pounds per hour; that the machine modified as per drawing K-11 operated "over several weeks" making ice at the same rate, but that the life of the stainless steel belts used on the machine through these modifications was about four days; that a closed end machine utilizing instead of an inside deflecting roller, outside rollers, one friction driven and one braked, so as to deflect outwardly the flexible belt, operated in the winter of 1938 producing ice at the rate of 150 pounds per hour, running from three to seven hours a day "throughout each week." It appears that the closed end machines referred to by Knowles consisted of the same evaporator drum and tank, with various modifications of packing gland, idlers, and rubber aprons being used throughout the course of the experiments. It appears from Knowles's testimony, for all of its many discrepancies, that a machine corresponding to counts 2 and 3 was operated successfully producing flaked ice for a period of several days at least.

Robert G. Zener, draftsman and engineer salesman from 1935 to 1941 in the employ of the firm of which Knowles was manager, testified that a machine constructed along the lines depicted in drawings K-9 and K-10 was operated for several months beginning about the middle of November 1938, improvements and changes being made during that time; that drawing K-11 depicts a chipped ice machine after its construction; that the first closed end machine made by Knowles "made ice over a protracted period" though "it wasn't satisfactory."

George Wilson, assistant manager of a dairy in Seattle, the site of Knowles's activity, testified that in November 1939 he witnessed a Knowles ice machine operate and produce ice, which "could have been as much as a hundred pounds" per hour, though he watched it operate but a half hour, and could recall little about the construction of the machine save that "there was a belt."

James Dan Knisely, a graduate mechanical engineer, intermittently in the employ of Knowles's firm from December 1937 until February 1943, testified that he worked on Knowles's ice machine "in the winter of '38 or the spring of '39" as a draftsman; that he made the drawing K-11 in December of 1938 or the spring of 1939; that Knowles had an ice machine in operation "all day long" making ice one day prior to the date he commenced the drawing, because he took notes and made sketches for drawing K-11 from time to time while the machine was operating that day. Knisely described that machine as having a rotating drum, a flexible metal belt, anti-freeze "inside of the metal belt," and end "dics" mounted on the shaft holding the drum and bonded to the metal belt by rubber sheeting.

Richard C. Walther, shop superintendent of Knowles's firm, testified that a machine corresponding to the K-9 and K-10 drawings operated, made a considerable amount of ice, and could be operated "a week at a time continuously" near the first of the year 1939, and that ice was delivered to a fish company who would haul it away in "four, five or six big fish boxes."

Bert Conover, a refrigeration workman employed at Knowles's firm from 1934 to 1940, testified that he worked on the Knowles ice machine; that "success of part of it came when we did enclose the ends before we ever really got to any continuous operation"; that the first closed end machine with anti-freeze operated probably for three days, making ice, "three or four hundred pounds an hour," which was "piled up on the floor" and not weighed; that the first belt lasted no longer than three or four days, "and after improving the belt we ran it quite a number of days." Some of the ice produced was given to fish companies and some to dairies. Mr. Conover testified that he did most of the assembling and running of the machine; that it was run only in the daytime, and that

procedure of running in the daytime and shutting down at night "kept going on for six months probably after we first got it going, just to make ice whenever we wanted to run it again"; that he couldn't give away all of the ice, so he cut a hole in the floor and let the ice go down into the basement.

Lloyd R. Graves, chief engineer of Knowles's firm, and in its employ since 1936, testified that work on the first Knowles closed end machine was completed and the machine in operation in October 1938; that the machine was operated intermittently until January 1, 1939; that it was operated "until we got a stock of ice high enough that we had to get rid of it somewhere"; that "lots of times we would operate until the stock on the floor was so high that we had to stop the machine and get rid of the ice"; that "considerable" ice was made before December 1938.

It sufficiently appears from the record that the closed end machine described by the foregoing witnesses conforms to the terms of counts 2 and 3.

Field contends that Knowles's disclosure is inoperative because in actual operation the Knowles machine "destroyed" the flexible belt. That destruction resulted, Field contends, because of "fatal defects" in the machine: failure of the belt to "track" on the rotating drum; crinkling of the belt resulting from the flexing of the belt by the deflector roller and the driving of the rotatable end closure plates by the apron connecting the plates and the belt; the "overhang" of the belt with respect to the evaporator drum and the deflector roller, which, when coupled with the "drag" of the apron connected to and "driving" the revolvable end closure plates tended to bend the edges of the belt as well as pull the rubber apron itself loose from its connection to the belt. Field and certain of his witnesses when shown the Knowles application drawings predicted that belt failure would result in the manner in which the evidence of Knowles's experiments later revealed they actually did occur. Field appears to be a pioneer in the flexible heat transfer surface art, beginning his work in that field in 1919, and being "intimately connected" with

its development since that time. Field's witness Lachmann, who testified as to the theoretical inoperativeness of the Knowles disclosure, had fourteen years' experience in that line. Those men are experts in the art of utilizing flexible belts in ice making. While Knowles was apparently well qualified in the refrigeration art generally, his first experiments in the field of using flexible surfaces in ice making seem to be in connection with the early developmental work in 1938 resulting in his patent application here in suit. Throughout his testimony and that of his employee witnesses, it appears that Knowles had little faith in proceeding along theoretical lines, such as predetermining the stresses and strains to which the flexible belts and aprons used in his device would be subjected, or preparing detailed layouts or blueprints after which his machine would be constructed. His faith appears to have laid solely in the procedure of building a machine and belt, and operating it until the belt wore out or broke, and then beginning anew with the benefit of the knowledge gained from the previous experiment. The record reveals unending activity by Knowles in modifying his machine, particularly the union of belt ends, the union of belt and rubber apron edges, and the arrangement of deflector rollers in a search for a machine which Knowles would consider suitable to market without the necessity of frequent servicing. The work on Knowles's machine was largely done in the shop of the firm he managed by men not skilled in the flexible belt art using for the most part fairly rought sketches for guidance.

In the cross-examination of Knowles, conducted by counsel for Field on December 4, 1945, the following testimony appears:

"518. XQ. And the stainless steel belt that we saw out there that had deformations in it, over what type of deflecting roller was it run? A. That was operated over several different types of rollers.
* * *

"519. XQ. Such as shown in Knowles Exhibit K–11? A. Yes.

"520. XQ. Is that the only type of deflecting means that you used on that par-

ticular belt? A. All that is important to this trial, I am sure.

"521. XQ. What other types? A. Oh, I have made any number of different type rolls in an effort to get the machine to a pont (sic) [point?] where I can put it out commercially and know that it will operate for a number of years.

"522. XQ. When you say 'a number of years,' five years? A. Five years."

Previously, on June 15, 1944, during the taking of testimony on behalf of Field, the witness Stover testified on direct examination, as follows:

"Q. 610. Can you tell what the life of the flexible cylinder on the HRB machine would be? A. It would be at least five years, that is continuous operation."

The board held that "for a machine to have practical utility to the public, belt life should be of the order of one to five years or better," and added that "while a five or even one year test would not be necessary it is considered reasonable and necessary that tests of the structure purporting to establish reduction to practice should show not only that ice was produced but that the belt had promise of durability."

To say, as we do, that the board was correct in holding that Knowles and his men (who from the record do not affirmatively appear to be skilled in the flexible heat transfer surface art at all) did not succeed in reducing to actual practice Knowles's inventive concept is not to say that the evidence of that failure affirmatively establishes that a skilled flexible heat transfer surface artisan could not without the exercise of invention construct an operative device from the Knowles application disclosure. The only evidence of record of any actual attempts to practice Knowles's disclosure is that put in by Knowles himself in his effort to establish actual reduction to practice prior to his filing date. That evidence while insufficient to demonstrate the longevity of operation required for a commercially practical device, did establish that a machine conforming to Knowles's disclosure and counts 2 and 3 did operate and successfully produce ice for an extended period of time. That defects remained whose solution was a condition precedent to successful marketability of the device does not of itself satisfy the burden resting upon Field in alleging inoperativeness to establish by a preponderance of the evidence that an artisan could not by making such modifications as his skill would lead him to make in a genuine effort to practice the Knowles disclosure construct a device which would operate with practical utility.

The testimony of Field, Lachmann, and Stover upon being shown enlargements of the Knowles application drawings was generally that the device there depicted would not "operate continuously," was not "commercially practicable," or was "impractical" because when in operation various of the relationships (of belt to drum, belt to roller, belt to apron to end closure plates) there depicted, as well as various of the expedients described in the Knowles specification to assist the belt in "tracking" (such as "crowning," "beading" the edge of the drum, and using V-shaped guides on the under side of the belt) would reduce the life of the flexible belt. Implicit in that testimony, however, was an acknowledgement that a machine built according to the Knowles disclosure *would operate somewhat.* Field himself introduced no evidence of any effort he had made to construct and operate a machine after the Knowles disclosure. Field did testify that tests were conducted under his direction running flexible belts over crowned rollers, as well as trying the other methods mentioned by Knowles to cause the belt to "track," which tests "were never successful with the metal subjected to the type of stress in the Knowles operation." These were not shown to be *inter partes* tests, but were apparently performed by Field *ex parte.* He made no test of the Knowles machine, nor did he introduce evidence bearing on whether the device was inoperative in the hands of a person skilled in the flexible belt art genuinely interested in making the machine operate under the bona fide application of the skill of the art. It will not do for Field to point to *Knowles's failure* to accomplish an actual reduction to practice and say that *a fortiori* the device was *inoperative* in the

hands of an artisan. We think Field has failed to carry his burden of proving by a preponderance of the evidence that the Knowles disclosure is inoperative in the hands of a person skilled in the art. Furthermore, we think that the evidence put in by Knowles in an effort to establish actual reduction to practice, while inadequate for that purpose, does affirmatively establish that his device will operate, imperfectly but satisfactorily, and this strengthens the presumption that his disclosure is operative.

### III. Field's alleged conception, reduction to practice, and diligence relating to counts 2 and 3.

The board awarded Field conception of a vertical machine (the VRB) satisfying counts 2 and 3 as of March 2, 1939, on the basis of working drawings (Exhibit F–25) completed that day. The board found that the VRB machine was constructed March 18, 1939, but held that a 5 day test commenced March 23, 1939, did not establish actual reduction to practice. The VRB was then adapted to the horizontal, designated the HRB, and operated on April 10, and 11, 1939. The board held that actual reduction to practice had again not been demonstrated, and found that after some desultory activity the project was dropped. Though Field's conception was earlier than Knowles, having failed to reduce his conception to practice, and forsaking diligence, Field was restricted to his filing date, and Knowles was awarded priority as to counts 2 and 3.

Field contends that he conceived the subject matter of counts 2 and 3 in May 1938, with actual reduction to practice established by the VRB and HRB machines in March and April 1939. He relies on a drawing of the "HS 1708" machine, begun May 15, 1938, and completed June 1938 for proof of his conception. One drawing of the set, 38031 (Exhibit F–18) depicts the device illustrated by Figures 4 and 5 of Field case C, is dated May 28, 1938, and is advanced by Field as "complete proof of conception." It is stated, however, in Field's brief that "The machine of these drawings differs materially from the machine (VRB—HRB) as reduced to practice, but has all of the elements of the counts." The HS–1708 machine was never built. Field's brief indicates that the machine had disadvantages: "Its cost was high for water ice"; "It could not run submerged"; "It did not meet York's [licensee of Field's assignee] commercial requirements." It is clear from the record that there was neither actual reduction to practice nor diligent activity in endeavoring to reduce to practice the device depicted as HS–1708. The only date to which Field would be entitled as a date of invention of the subject matter of counts 2 or 3 insofar as he relied on the HS–1708 would be his filing date in case C as a conception and constructive reduction to practice.

From January 16 to 26, 1939, the working drawings for Field's VRB–1132 machine were completed (Exhibit F–22). Drawings depicting alternate designs for the evaporator drum of the VRB–1132 were completed January 27–28, 1939 (Exhibit F–24). These represented a simplification of the structure shown in Exhibit F–22. Those drawings (F–22 and F–24) were placed before the licensee of Field's assignee on February 2, 1939. The next day Field instructed his employee Stover to "start layout" of a smaller VRB machine. Drawings (Exhibit F–25) of the smaller VRB were completed on March 2, 1939. A machine was built in accordance with those drawings and photographed. It was a simplification of the previous VRB drawings: all refrigerant stuffing boxes were eliminated and one end of the machine "greatly simplified" so that it could be fastened securely to the frame of the machine, reducing the strength and number of parts required. It was this simplified concept of the VRB machine which Field set out to reduce to practice. So far as the record reveals, the earlier concepts of VRB (Exhibits F–22 and F–24) never progressed beyond the conference of February 2, 1939: no effort was made to embody them in an actual machine. Bids requested from manufacturers were, according to Field's brief, high. Plainly Field may not rely on the original VRB drawings (F–22 and F–24) for conception. There was neither actual reduction to practice nor any diligent endeavor to reduce that early

concept to practice. Those drawings may not be relied upon by Field to establish a date of invention prior to his filing date.

Was Field successful in his efforts to reduce the concept depicted by his F-25 drawings to practice? After the drawings were completed on March 2, 1939, little time was lost in constructing the machine. Work had begun even before the full set of drawings was completed. The machine was assembled by March 9, 1939, but difficulties arose with the aprons and the deflecting rollers' tension means. On March 23, 1939, a five day test of the machine was begun under the supervision of Field's employee Stover. On March 28, 1939, Stover wrote a memorandum report to Field concerning the test. During the test the deflecting rollers (which in operation rotated 360° flexing the belt or cylinder as they turned) were operated by hand by means of a crank attached to the drive shaft. During the test the water feed failed due to pump trouble. Refrigerant was applied throughout the five day period. The purpose of the five day test according to Stover, Field's employee in charge, was to determine whether the seal between the belt or cylinder and the evaporator drum was tight so that moisture from the atmosphere was excluded. According to Stover, that was determined "by making ice on the machine when it was first set up and determining the rate of heat transfer and making ice again at the conclusion of the test, checking that we had no falling off of the heat transfer rate." The deflection roller was operated "intermittently by hand," "one or two times a day over a period of maybe two or three hours." Anti-freeze was not used between the evaporator and the flexible belt or cylinder during this test. On April 4, 1939, the machine was turned from its vertical operating position and adapted to a horizontal operating position. Field considered it advantageous to operate the machine in its vertical position when freezing water, but in a horizontal position when freezing material other than water, such as fruit juices, milk, cream, eggs, etc. The HRB (the VRB when in a horizontal position) was tested April 8, 1939, with the deflecting rollers being turned by hand intermittently while the water feed

mechanism was lifted out of the feed position by hand as the crank actuating the deflecting rollers was turned. Ice was produced. Anti-freeze was used between the flexible cylinder and the evaporator. The rollers were operated by hand, both in an oscillating and rotating manner. On April 12, 1939, coffee, tea, and orange juice were frozen on the machine (HRB). The machine was operated for thirty minutes on April 15, 1939, producing ice, as a result of which the tester, Stover, estimated the capacity of the machine at 1,600-1,700 pounds of ice per day "after giving effect to remedies." During that test, the deflecting roller was turned by hand every 1½ minutes "to harvest the ice formed."

It appears from the testimony of Field that when the deflecting roller of the HRB is rotated, the flexible belt or cylinder "tends to travel in the direction of the deflecting roller arm, and after having travelled to the limit provided by the slack in the aprons * * *, then slips back, and from that time on creeps, so that there is a sliding action while it is held at that limit."

Subsequent to the tests of the HRB machine, drawings were made (Exhibit F-65) beginning May 29, 1939, and completed July 1, 1939, which, according to Stover, "were laid out to incorporate our best ideas on the HRB type machine at the time." That machine was to be known as the HRB 1212. The capacity of the HRB was to be one ton, and Stover was to design a 2½ ton and 5 ton machine, and arrange to send drawings out for bids on the three sizes of HRB machine.

It appears from Stover's testimony on cross-examination that a proposed drive mechanism for the VRB-HRB machine, to consist of a hydraulic cylinder and rack structure, was never assembled, though some parts were purchased for it after the tests, because "the type FRB machine interposed there and took precedence over this work." The board correctly held that "The work upon the FRB machine which took precedence over the VRB-HRB machine can be of no benefit to Field as to counts 2 and 3" because "Field as to counts 2 and 3 is a sole inventor whereas the FRB machine is the subject matter of the companion

interference wherein it is the joint invention of Field and Stover." Field does not dispute the finding that the FRB was the product of the joint effort of Field and Stover, and, indeed, relies on it for a reduction to practice of the subject matter of Interference No. 81,217.

■ The board held there was no reduction to practice of the VRB–HRB machine because it was not power operated, nor operated over a prolonged period. We fully agree with the board that the showing of practical utility for the machine's intended purpose required for actual reduction to practice demanded that the machine be operated for a prolonged period of time under power-driven conditions in order that the life of the belt and aprons as well as the practicability of the feeding apparatus be ascertained with sufficient certainty as to establish the probable success of the device as a commercial machine. The creeping of the belt on the evaporator when the deflecting rollers were rotated would tend to keep the rubber aprons under a condition of strain. Whether the rubber aprons could perform their function adequately could only be established by tests under full and normal operating conditions covering a sufficiently lengthy operating period. As for the flexible belt itself, the central object of the search for a practical machine was satisfactory belt life. Intermittent hand operation would not reveal whether the belt or the aprons could withstand the stress and strain of power operation under the prolonged operating conditions which appellant's witness Stover described as often requiring twenty-four hour a day operation. If a probable life of from one to five years is a requisite for commercial practicability when the flexible belt used by Knowles is under scrutiny, it is likewise a test to which Field ought to conform in endeavoring to establish actual reduction to practice. The evidence of the brief hand operated tests offered by Field is insufficient to show any particular probable belt or apron life. Field has failed to carry his burden of proving actual reduction to practice.

■ The fact that Field failed to complete the VRB–HRB by installing the power-drive mechanism, and that he turned to the higher priority FRB machine development after the April 1939 tests warrants the finding of the board that Field was wanting in diligence during the critical period in reducing his March 2, 1939, VRB–HRB concept to practice. That Field instructed Stover to complete designs and procure bids for the HRB 1212 as well as the 2½ and 5 ton counterparts thereof may indicate Field's satisfaction with ·the April 1939 tests, but it is not persuasive in determining whether the HRB had real practical utility for its intended purpose under normal operating conditions. Nor does it constitute diligence in testing and perfecting the machine for such purpose. An actual test under normal operating conditions was called for: the hand operated tests do not answer that need for a machine intended as a power operated device able to withstand 24 hour a day operation, or a five year life.

*IV. Field's contention relating to actual reduction to practice of the subject matter of count 1.*

There remains the contention of Field that the board erred in holding that the subject matter of count 1 had not been actually reduced to practice prior to his filing date. The board held that Field was entitled to the date of February 2, 1938, for conception of count 1 on the basis of drawings (Exhibit F-8) bearing that date. A machine, known as the Type S, was constructed from those drawings in April 1938. It was an open end machine employing anti-freeze (glycerine at first; propylene glycol later) between the evaporator surface and the flexible belt. Because of various difficulties connected with the nature of that open end machine, the board concluded that "the type S machine would operate to make ice in the hands of a watchful expert in the art but in the intended small ice field of utility it was impractical." The board therefore held that Field was not entitled to a date of actual reduction to practice prior to his filing date, but that his disclosure was operative. Since the board had held that Knowles's disclosure relating to count 1 was inoperative, he had nothing on which to rely in

contesting priority of invention, and Field's disclosure being held operative, the board awarded priority to Field without the necessity of considering whether or not Field was diligent during the time between his date of conception and his filing date. Knowles took no appeal from the award of priority of count 1 to Field. Field in his appeal, despite his uncontested award of priority as to count 1, has, however, included 14 reasons of appeal directed to the board's findings and conclusion that Field's Type S machine was "impractical," required a "watchful expert in the art," and was not an actual reduction to practice of the subject matter of count 1.

Is this a matter to which the court should give its attention?

R.S. § 4904, 35 U.S.C. § 52, 35 U.S.C.A. § 52, confers jurisdiction upon the Board of Interference Examiners "to determine the question of priority of invention."

R.S. § 4911, 35 U.S.C. § 59a, 35 U.S.C.A. § 59a, entitles any party to an interference "dissatisfied with the decision of the board of interference examiners" to appeal to this court.

R.S. § 4912, 35 U.S.C. § 60, 35 U.S.C.A. § 60, requires the party taking the appeal to "give notice thereof to the commissioner, and file in the Patent Office * * * his reasons of appeal, specifically set forth in writing."

R.S. § 4914, 35 U.S.C. § 62, 35 U.S.C.A. § 62, confers jurisdiction on this court to "hear and determine such appeal" and to "revise the decision appealed from in a summary way," confining itself "to the points set forth in the reasons of appeal."

 Field's Notice of Appeal states that he "gives notice to the Commissioner of Patents of his appeal to the U. S. Court of Customs and Patent Appeals from the decision of the Board of Interference Examiners, rendered on or about the 28th day of May, 1948, *awarding priority of counts 2 and 3* of the invention to Frank W. Knowles * * *." [Italics added.] This then is Field's appeal—from the decision of the board awarding priority of invention on counts 2 and 3 to Knowles. It is this appeal for which he must set

forth his specific reasons of appeal. The fourteen "reasons of appeal" directed to the board's findings relating to count 1 which Field included among the 47 reasons of appeal set forth in his Notice of Appeal must be overruled as pertaining not only to a part of the board's decision from which no appeal was taken, but also as pertaining to a count on which the appellant has been awarded priority by the board. No decision of the court on the matters touched by those fourteen reasons of appeal could possibly change that award of priority. As said by the court in Harris v. Henry, 63 F.2d 120, 122, 20 C.C.P.A., Patents, 883, 887, "unless the question of priority be involved, this court would have no jurisdiction to entertain the appeal, since, in an interference proceeding, priority is our sole concern." The appellee Knowles having taken no appeal from the award of priority of invention of the subject matter of count 1 to Field, that decision is final and incontestable between the parties. The court is without power to affect that decision, and will not do the useless thing now of considering the board's grounds for its decision on an issue which is moot. Shellaberger v. Schnabel, 10 App.D.C. 145.

The decision of the Board of Interference Examiners awarding priority of invention on counts 2 and 3 in Interference No. 80,398 to Knowles is affirmed.

Interference No. 81,217, P.A. 5693.

The subject matter of this interference is required by the counts to be comprised of a rotating evaporator drum; a flexible belt larger than and encompassing the drum; means for tensioning the belt around the drum; and means for closing the ends of the belt. The counts read as follows:

"1. In a heat transfer device: a heat transfer drum: an endless imperforate belt, said belt being longer than the circumference of said drum, and being placed around and in contact with said drum; means for tensioning said belt around said drum; means for rotating said drum and driving said belt; end means closing the end openings of said belt for forming therewith a closed chamber; and a liquid in said chamber and in contact with said belt and drum,

which liquid will remain liquid at the operating temperature in the device.

"2. In a refrigeration device: a rotatable heat transfer drum; an endless imperforate belt, said belt being longer than the circumference of said drum, being placed around and in contact with said drum, and being movable with said drum; end means closing the end openings of said belt; and means for refrigerating said drum by evaporation therein of a refrigerant.

"3. In a heat transfer device: a heat transfer drum; supporting trunnions for said drum; means for supplying to and removing from said drum through one of said trunnions a heat exchange medium; an endless imperforate belt, said belt being longer than the circumference of said drum, and being placed around and in contact with said drum; end plates mounted on said trunnions and opposed to the ends of said drum; a stretchable medium secured between and to the edges of said end plates and belt; said trunnion, stretchable medium, and end plates closing the end openings of said belt for forming with said belt a closed chamber; a tensioning roll placed inside of said chamber, and outside of and parallel to said drum; means supporting said roll on said trunnions and in contact with said belt for tensioning said belt; and means for rotating said drum by rotating one of said trunnions."

Knowles relies on the same apparatus and activities considered in the companion interference. Field and Stover attack the operativeness of the Knowles disclosure in the same manner as there discussed.

For the reasons developed at length in Interference No. 80,398, P.A. 5692, we concur in the board's finding that Knowles is entitled to his filing date, March 20, 1939, for his date of invention of the subject matter of this interference, the counts of which read upon the closed end machine disclosed in Knowles's application. Likewise, the contention of Field and Stover that Knowles's disclosure is inoperative is overruled for the reasons stated with respect to Field's similar contention in the companion interference.

Appellants alleged in their preliminary statement conception of the subject matter of the counts on February 12, 1938, with reduction to practice in March 1940, which, being subsequent to Knowles's filing date, placed appellants under the burden of proving conception prior to Knowles's filing date and reasonable diligence down to their subsequent reduction to practice, actual or constructive.

The Knowles disclosure is described in the companion interference.

The application of Field and Stover, No. 352,710, discloses a cylindrical evaporator drum, horizontally disposed and driven by a shaft. The drum is encompassed by an endless flexible belt, larger in diameter than the drum. Deflecting rollers at each end of the drum mounted on supporting arms sleeved to the drum drive shaft and connected by a shaft extending between the rollers, are positioned between belt and drum, tensioning the belt into contact with the drum surface. The evaporator drum rotates, driving the belt by friction and flexing it over the deflecting rollers. The position of the deflecting rollers is maintained constant by counterweights. The edges of the flexible metal belt are connected by means of rubber aprons to rotatably mounted end "bells" or plates of a diameter approximating that of the endless metal belt. The end closure "bells" seal off the interior of the apparatus from the atmosphere. Propylene glycol is used between the drum and belt surfaces as a heat transfer medium and lubricant. The drum is positioned partially within a vessel to be filled with water so that water is fed to the surface of the belt as the drum rotates, freezing as the belt travels over the top of the drum, and flexing off as ice as the belt passes over the upwardly projecting deflecting rollers.

Appellants contend that conception of the subject matter of counts 1, 2, and 3 "culminated" on September 15, 1938, in a sketch accompanied with a description (Exhibit F-32) made by Stover of an evaporator drum with refrigerant inlet and outlet pipes entering the interior of the rotatable drum through the center shaft. The drum is depicted as bound at both ends to end bells or plates joined to the drum shaft by a threaded union as well as by integrating

pins. Field testified that as the end bells rotate "they carry with them the drum." Stover testified that the sketch and description disclosed a device which was the result of the joint endeavor of himself and Field. Appellants had no rotating evaporator available when Stover made his sketch (Exhibit F-32), and Stover testified that the York Ice Machinery Corporation "had to develop the rotating evaporator."

There was an arrangement between York and Flakice (the assignee of the Field and Field and Stover applications) whereby "York was to build a rotating evaporator of the type DER and Flakice was to have the use of this evaporator in a development of the RSB [FRB] machine." Exhibit F-33 is a letter dated *December 19, 1939*, from York (signed by one Raver) to Stover at Flakice enclosing layout prints "showing the details of the evaporator, shaft and seals as used in our [York's] experimental machine." Stover testified that the prints were sent to him so that he "might incorporate the DER evaporator in a machine of the Type RSB [FRB] which we were to build as soon as possible." The evaporator itself was subsequently shipped to Flakice and incorporated into the RSB [FRB] machine. In *January 1940*, Stover made drawings (Exhibit F-37) incorporating the York evaporator design into the RS machine. Stover testified that a machine was never built with end bells fixed with relation to the evaporator [as depicted in his sketch (Exhibit F-32)]; that before the machine was built, the end bells were changed to free turning. The F-37 drawings were revised in April and May 1940 so as to change the end bells from fixed to freely rotating. From those revisions (drawings, Exhibit F-31), the FRB machine was constructed.

It appears from the record that small ice machines of the type involved in the interference, which are designed for use in stores, restaurants, and the like, must use a Freon refrigerating system, as municipal regulations and fire insurance rules prevent the use of ammonia. The use of Freon presents particular problems: "it has to be maintained at a high velocity in order that any oil from the compressor system may be carried with it and not dropped out"; the passage carrying the refrigerant must be designed in proportion to the specific volume of Freon refrigerant; and improved stuffing box or gland seals are required to seal in the Freon. Rotating evaporators, moreover, present the particular problem of preventing the oil carried by the refrigerant from being deposited on the inner surface of the evaporator, as the oil acting as a heat insulator would tend to retard the effectiveness of the evaporator.

York and Flakice were working together on the development of small-sized ice machines, and Field testified that "York devoted its attentions primarily to the rotating evaporator and the evaporator questions and Flakice to the belts"; and that the DER development, the rotating Freon evaporator, was developed by York engineers. York experienced trouble in developing the Freon evaporator, particularly in designing the rotating gland to seal the Freon in the drum, and in getting uniform coverage of the Freon evaporating into gas all along the inner evaporator surface.

Field's invention notebook at page 1770 (Exhibit F-6) contains a rough sketch and accompanying description dated *October 23, 1939*, entitled "A modification of the H.R.B. Type (R.S. type?)" depicting, *inter alia*,

1—Revolving Evaporator
2—Stationarily supported Revolving deflection Roller
3—Flexible cylinder
4—Revolving Endbells to which cylinder aprons are attached.

Those elements as well as a fifth relating to a trunnion assembly for introducing gaseous refrigerant into the evaporator drum are all present in the Field and Stover application disclosure. When asked the circumstances of making that *October 23, 1939*, disclosure, Field testified as follows:

"The DER evaporator troubles seemed to be getting to a close so that we would have from York in the very near future after that date a rotating type of evaporator, and with this rotating type of di-

rect expansion evaporator it was time to go ahead faster on the alternate development of ours which called for the belt around the rotating evaporator. So that is why I started out working on details like this of October 23, 1939 * * *."

On *October 26, 1939,* a conference was held, attended by Field and Stover, at which it was decided that "ECS [Stover] will start sketches of R.S. type FI machine (see C.F.'s FI N.B., p. 1770) showing alternate constructions, including amongst others his idea of weight suspended deflecting roller structure, and upon discussion of these he will start detailed design."

Drawings (Exhibit F-36) of the RS machine were prepared in November 1939 by Stover. On December 14, 1939, a conference was held between York and Flakice representatives at which the decision was made "that Stover should start the designs of an RS machine which would be based upon the DER evaporator drum." The RS became known as the FRB, the distinction between the two being, according to Field, that "In the RS the end bells were so fixed to the shaft that they had to turn on the evaporator drum," whereas "in the FRB they could be operated independently of the joining of the drum." In the RS construction, the flexible belt was caused, because of the fixed end bells, continuously to slip with respect to the evaporator drum.

After York was successful in building a rotating evaporator, it was patented in the name of the engineer who developed it. Patents to Raver, No. 2,308,541, issued January 19, 1943, on a December 7, 1939, application; No. 2,344,922, issued March 21, 1944, on a January 13, 1941, application.

It is apparent from the record that Field and Stover were unable to complete the design for their rotating drum evaporator ice machine until York developed the rotating evaporator and furnished layout details to them. Because of the difficulties inherent in a rotating evaporator, and in particular with one in which Freon refrigerant was to be used, York's development required time. Actual layout prints of the successful evaporator were not sent

Field and Stover until December 19, 1939. Only when the details of that evaporator design were incorporated into the drawings prepared by Stover in January 1940 (Exhibit F-37) was there disclosed a complete concept of an ice-making machine, responding to the interference counts, in such detail as to enable one skilled in the art to construct an operative counterpart. It is evident that Field and Stover were unable to design the rotating evaporator itself. That being an essential part of the machine, conception of the machine as an entity was not complete until December 1939 or January 1940 at the earliest. Previous to that time, the idea of a fexible belt ice machine consisting in part of a rotating evaporator was, insofar as the evaporator was concerned, merely posing a problem for solution rather than a complete concept sufficiently detailed so as to enable an artisan guided by the disclosure of that concept, successfully and without invention on his own part, to make the machine.

The conception required as an element of invention is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is to be applied in practice, Burson v. Vogel, *29* App.D.C. 388—the mental process must have been completed and brought to a point where reduction to practice can begin, where invention stops and construction begins. Townsend v. Smith, 36 F.2d 292, 17 C.C.P.A., Patents, 647. It is not sufficient that the *result* to be obtained be conceived, but it is required that there be conceived and disclosed the *means* provided to accomplish that result, Land v. Dreyer, 155 F.2d 383, 33 C.C.P.A., Patents, 1108.

Here both Field and Stover acknowledged that the rotating evaporator had to be designed by York, and until York made the drawings of the successful evaporator, there could be no finished concept of the ice machine in which the rotating evaporator was to be an essential part. After the layout of the rotating evaporator was received from York, Stover had to design a machine so as to incorporate and accommodate the design of the evaporator into it. There was no finished concept from

which reduction to practice could be attempted until January 1940.

The board held that although Field and Stover may have had definite ideas as to what they wanted to build, they were unable until the York drawings were received in December 1939 to have a definite and permanent idea of the invention as it was thereafter to be applied. The evidence as indicated in the foregoing review thereof adequately supports that finding. The earliest date to which appellants are entitled for conception, December 1939 or January 1940, is subsequent to the date of invention accorded to Knowles on the basis of his application filing date, March 20, 1939, for a constructive reduction to practice. It follows that the decision of the board awarding priority of invention as to all counts of the interference to Knowles must be, and is, affirmed.

Affirmed.