54 CCPA

**John A. CHASE, Roy K. Wolke, Frank J. Pilas and Daniel K. Battstone, Appellants,**

v.

**Stanley J. GARTNER, Appellee.**

**Roy K. WOLKE, John A. Chase, and Frank J. Pilas, Appellants,**

v.

**Stanley J. GARTNER, Appellee.**

Patent Appeals Nos. 7886, 7887.

United States Court of Customs and Patent Appeals.

March 30, 1967.

Rehearing Denied June 22, 1967.

A. Russinoff, Princeton, N. J., for appellants.

Amster & Rothstein, New York City (Morton Amster, New York City, of counsel), for appellee.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

RICH, Judge.

These appeals are from decisions of the Board of Patent Interferences awarding

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

priority of invention to Gartner in interferences Nos. 92,264 and 92,265.

Each interference involves Gartner's application serial No. 790,570 filed December 9, 1947, entitled "Assembling Machine and Method," assigned to Sylvania Electric Products, Inc.

Interference No. 92,264 also involves a patent to Chase et al. No. 2,842,832, issued July 15, 1958, on an application filed April 2, 1951, entitled "Apparatus for and Method of Automatic Assembly of Electron Tube Parts to Form an Electrode Cage," assigned to Radio Corporation of America.

Interference No. 92,265 involves a patent to Wolke et al., No. 2,884,684, issued May 5, 1959, on an application filed February 2, 1954, entitled "Apparatus for Automatically Assembling Electron Tube Parts to Form an Electrode Cage," also assigned to Radio Corporation of America.

These interferences are concerned with apparatus for the assembly of a part of an electron tube known as an "electrode cage." [1] The issue in each is whether Gartner has a right to make the counts.

The apparatus in question includes an endless conveyor chain which carries several "jigs" or "mica blocks" to loading stations. At each station a different component of the "electrode cage" is loaded onto the jig. The conveyor chain positions the jigs roughly at each loading station. It is then necessary to align the jig very precisely with respect to the loading mechanism. The means by which this final orientation is effected is at the center of this controversy.

The respective appellants, Chase et al. and Wolke et al., disclose the need for precise orientation and the means for its accomplishment. The Chase et al. disclosure reads in part:

An important feature of the invention is a resilient support for the jigs * * *. Each of the jigs is supported on [a] bracket * * * by means of a screw * * * extending through [an] oversize opening * * * in the bracket. A washer * * * made of resilient material, such as rubber is interposed between the head of [the] screw * * * and the bracket * *.

This resilient mounting of the jigs is advantageous in correctly positioning a jig in accurate registry with a loading mechanism. Thus when slight inaccuracies in the chain * * * dispose a jig out of registry with a loading mechanism, the jig is permitted relative movement with respect to the chain when acted on by the positioning and locking mechanisms to be described. This relative movement is important, since the chain may be incapable of movement during stationary portions of its cycles of operation, to permit correction by the positioning and locating mechanism of a faulty registry. [Reference numbers omitted.]

The jigs are thus mounted in such a way that finer alignment at the loading station is possible in both the vertical direction (because of the resilient mounting) and the horizontal direction (because of the oversize openings in the brackets).

The Gartner application also discloses at least some aspects of the final orientation problem:

When mechanically assembling relatively small parts such as are employed in radio tubes, comparatively accurately spacing or positioning the parts before relative movement thereof into the assembled position is an imporant consideration. Where a fixture is used as in the illustrative machine, and it is conveyed past multiple assembling units in succession, it is desirable to include a fixture-orienting mechanism adjacent each unit.

---

1. An "electrode cage" apparently includes the cathode, anode and such control grids as are required for the completed tube.

It elaborates as follows: See Fig. 10 of the Gartner application, reproduced below.

*The conveyor* transports the several carriers to positions opposite the various units, but *is of limited efficacy in accurately orienting the mica blocks 38.* The mechanism for locating the mica blocks and the construction of the blocks themselves is illustrated in detail in Figs. 9 to 15 inclusive. Each mica block 38 comprises several rigidly assembled portions including studs 100 by means of which the block is suspended from its carrying plate 36 * * *. Hardened inserts 104 and 106 are also provided in block 38, the first having a bore and the latter having a groove for engagement by locating pins that are projected against the block at the end of each conveyor indexing operation. * * * [Emphasis added.]

\*    \*    \*    \*    \*    \*

It will be observed that the diameters of the bellows are unequal. An extension 134 is provided on the movable end of the larger bellows, in this instance on the lower bellows 128, for engagement with adjustable stop 136 in frame 114. *By virtue of this arrangement the mica block* opposite pins 130 and 132 *will be accurately centered* by those pins and the level to which the mica block is finally driven by the opposing pair of pneumatic bellows is determined [by] coaction of extension 134 and 136. The pneumatic acutating means may evidently be replaced by other suitable operating mechanism, and mica blocks 38 are representative of any work-supporting fixtures suitable to the assembly being made. [Emphasis added.]

FIG.10

Pins 130 and 132, actuated by means not here relevant, slide into "inserts" 104 and 106. It is manifest that the mica block or jig 38 is so mounted on the plate 36 that orientation in the vertical direction can be effected by manipulation of the pins 130 and 132. The question arises over the possibility of orientation in the horizontal direction.

Each interference involves several counts. Counts 1, 7, and 11 of interference No. 92,264 read:

1. An apparatus for automatically assembling electron tube parts to form an electrode cage, including a movable flexible conveyor, a plurality of loaders disposed along said conveyor, a plurality of jigs mounted on said conveyor for movement therewith, means for intermittently moving said conveyor to dispose said jigs into approximate loading positions adjacent said loaders, means for more accurately disposing said jigs in said loading positions, said last-named means including relatively movable members on opposite sides of said jigs for moving the jigs with respect to said conveyor into said more accurate loading positions.

7. Apparatus for processing electron tube parts, comprising a first member movable in a predetermined path, a second member mounted on said first member and movable with respect to said first member in a plurality of normal paths including said predetermined path, and adapted to receive said parts, a plurality of processing mechanisms spaced in said path, means for intermittently moving said members in said path, whereby said members are intermittently stopped in positions successively to dispose said second member in approximate registry with said mechanisms, means for locking said first member against movement when said second member is in said approximate registry with one of said mechanisms, and means adjacent said second member in said approximate registry for moving said second member with respect to said first member in at least one of

said paths into a more accurate registry with said one of said mechanisms and for locking said second member in said more accurate registry for accurately loading said parts on said second member.

11. Method of locating a first part accurately in a loading position for build-up thereon of a second part to form a sub-assembly, said method comprising moving said first part rectilinearly in one direction and approximately into said loading position, then moving said first part in another direction normal to said one direction and into a plane including said loading position, then moving said first part in said plane and in a direction normal to said another direction and towards said loading position, and stopping said first part when accurately in said loading position.

Count 1 of interference No. 92,265 reads:

1. Apparatus for automatically loading a part to form an assembly, comprising a jig movable in a predetermined path, two locating mechanisms spaced in said path, means for actuating one of said mechanisms into engagement with said jig for accurately locating said jig in a position to receive said part, means adjacent to said position for loading said part on said jig, and means for actuating the second of said mechanisms into engagement with the loaded part for accurately locating said part, whereby said part is in a position for buildup thereon of a second part.

After preliminary statements were filed, appellants were placed under an order to show cause why judgment on the record should not be entered against them inasmuch as their earliest allegations failed to overcome appellee's filing date. Appellants then moved to dissolve the interferences on the ground that appellee had no right to make the counts for the reason, among others, that the appellee had not disclosed an operative apparatus. The parties eventually took testimony on the operativeness of appellee's disclosure. The appellants also

placed before the board the question of whether appellee's specification would support those limitations in counts 6–8 and 10–12 in interference No. 92,264 which specifically require provision for horizontal orientation.[2]

Appellants arranged for the construction and inter partes test of a demonstration machine. The machine was said to have been built very carefully with special effort to follow the teachings of appellee's specification. The machine was found incapable of assembling tube parts. It was not able to position the jigs adjacent the loading stations within the required tolerances. It transpired that the reason for the disappointing performance lay in the failure of appellants to utilize oversize openings at the point where, referring to Fig. 10, supra, the studs 100 pass through the plate 36.

Appellee, of course, denied the propriety of such an omission. He pointed to the following extracts from his specification as indicative of his appreciation of the necessity for the oversize openings and his provision for them:

It will be observed that the diameters of the bellows are unequal. An extension 134 is provided on the movable end of the larger bellows, in this instance on lower bellows 128, for engagement with adjustable stop 136 in frame 114. By virtue of this arrangement *the mica block* opposite pins 130 and 132 *will be accurately centered* by those pins *and the level to which the mica block is finally driven* by the opposing pair of pneumatic bellows *is*

*determined* [by] coaction of extensions 134 and 136. [Emphasis added.]

\* \* \* \* \* \*

The conveyor comprises a chain \* \* \* to the links of which there are secured a plurality of plates 36 for loosely suspending mica blocks 38.

The board agreed with appellee:

\* \* \* the real matter in issue is whether one skilled in the art from reading the Gartner application would expect the cooperation of the pins 130 and 132 with the cooperating recesses and grooves in the mica blocks to center the mica block horizontally of the loading station as well as vertically. The paragraph \* \* \* of the Gartner application relating to the centering action is not specific in this regard but rather describes the action somewhat broadly \* \* \*.

[Appellee] states that the mica block is centered by the pins mentioned and then adds the additional statement as to the determination of the level of the block. We believe as did the Primary Examiner[3] that this conveys the impression of two distinct actions, first a centering action by the pins and cooperating recesses, then a vertical movement terminated by engagement of stop extension 134 with stop screw 136.

\* \* \* \* \* \*

\* \* \* the centering action mentioned \* \* \* [in the Gartner specification] together with the term "loosely suspending" would indicate to

---

2. The following limitations are typical. Count 7.—"\* \* \* a second member mounted on said first member and movable with respect to said first member in a plurality of normal paths including said predetermined path, and adapted to receive said parts, \* \* \*" Count 11.—"\* \* \* then moving said first part in another direction normal to said one direction and into a plane including said loading position, then moving said first part in said plane and in a direction normal to said another direction and towards said loading position, \* \* \*"

The full text of counts 7 and 11 is reproduced supra.

3. The Primary Examiner decided that: \* \* \* the disclosure that the mica blocks "will be accurately centered" by "conical-ended" pins clearly conveys the teaching that the blocks will be *both* oriented in universal fashion to a determined vertical plane and also located in a determined horizontal plane, *both* by virtue of bringing the pins together or toward each other by the particular arrangement of pneumatic motors. The action or operation of Gartner cannot be otherwise.

one skilled in the art the suspension of the mica blocks from the chain should be sufficiently loose to permit accurate centering of the mica blocks by the action of the pins 130 and 132.

The board also commented:

Having reached this conclusion, we believe further that in 1947 when the Gartner application was filed one skilled in the art would mount the mica blocks on the conveyor chain with sufficient looseness to allow complete centering action by the pins and recesses.

The board reasoned that, under the doctrine of Field v. Knowles, 183 F.2d 593, 37 CCPA 1211 (1950),

* * * the disclosure of an application placed in interference by the Patent Office is presumed to be an operative disclosure and will not be held to be inoperative unless it is established by a preponderance of the evidence that it can not be made to operate for any practical or useful purpose by changes short of invention which one skilled in the art would be capable of applying in making the device with the specification and drawings of the application as his guide. The burden of proof may be carried with evidence of inter partes tests of devices so built but such tests may be accorded little weight where it appears that the testor did not utilize the skill of the art to overcome difficulties.

It therefore held that the inoperativeness of appellee's disclosure had not been established. Its conclusion was "strengthen[ed] in some degree" by appellee's evidence of the manufacture and use of an operative machine in the years 1951–1952.

The board disposed of appellants' question of support with this comment:

We have answered this contention in our holding above that the Gartner application teaches that the pins 130 and 132 perform a lateral or horizontal centering action followed by accurate locating action in a vertical direction.

This latter statement seems to us to clarify the board's fundamental position on the question of operativeness as well as on support. The board has found that the appellee's disclosure *does* include provision for lateral movement of the jigs with respect to the chain.

This conclusion finds substantial support in the record. We agree with the board that, although appellee's description of his centering action is somewhat broad, it is quite consistent with horizontal orientation. We see no convincing rebuttal of the examiner's view that the inevitable effect of the use of the "conical-ended" pins is some degree of horizontal adjustment, if the jig is adjustable.

Appellants' case ultimately rests on a denial of that adjustability. And the deficiencies of appellee's Fig. 10 lends support to that denial. We are satisfied, however, that one of ordinary skill would perceive the conflict between the advantage promised for final alignment and the apparent showing in the sketched embodiment of only uniplanar subjection to that alignment and would naturally discount the latter. It would be very difficult to believe that one of ordinary skill would be unable to see the need for some lateral freedom for the jigs when, looking at Fig. 10, he realized the need to overcome the inadequacies of the conveyor chain in respect of horizontal alignment. Appellants' witness, to be sure, has testified that the general theory of machine design, at the time of appellee's filing, demanded close tolerances in precision machinery. The question here, however, is whether one skilled in the art, *with appellee's specification before him,* would be led to the application of such a principle at the crucial points; whether, with the statement of the "limited efficacy" of the conveyor chain in effecting accurate orientation before

him, he would persist in binding the jig ever more closely to the chain. It seems to us that he would not.

We think that substantial basis has been shown for the factual inference that one of ordinary skill in the art would be led by appellee's specification to construct the apparatus with provision for lateral movement, e. g., with oversize holes.

This determination is dispositive of both the issue of operativeness and that of support.

The decisions of the board are affirmed.

Affirmed.