**Jean N. NICOLAOU, Appellant,**

v.

**Michael COOPERMAN, Appellee.**
**Patent Appeal No. 8439.**

United States Court of Customs and Patent Appeals.

Feb. 25, 1971.

---

**994**

———◆———

Darryl Mexic, Richard C. Sughrue, Sughrue, Rochwell, Mion, Zinn & Macpeak, Washington, D. C., attys. of record, for appellant.

A. Russinoff, Princeton, N. J., for appellee.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and FORD, Judge, United States Customs Court, sitting by designation.

ALMOND, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences involving appellant's application [1] and appellee's patent [2] and awarding priority to the junior party, the patentee Cooperman.

The subject matter in the interference relates to solid state display devices having an electroluminescent layer coupled to a layer of ferroelectric material. The ability of the ferroelectric material to distribute an A.C. signal to the electroluminescent layer is based on the impedance characteristic of the material. When a particular voltage, known as the coercive voltage, is applied to the ferroelectric material, it exhibits a low impedance to small A.C. signals. At other voltages, it exhibits a high impedance to such A.C. signals.

An A.C. signal is applied across the combination of the ferroelectric and electroluminescent layers and gets through the ferroelectric layer in sufficient amounts to energize the electroluminescent layer (and render it luminous) only in a region where low impedance exists. A bias voltage is applied to the ferroelectric layer in such manner that the voltage imposed varies from one end of the material to the other end at any instant. By varying the bias voltage, the coercive or critical voltage position moves across the ferroelectric layer. This causes the region of low impedance to move across the ferroelectric layer which in turn results in a region of light being swept across the electroluminescent layer.

The eleven counts of the interference are claims copied from the Cooperman patent. The broadest count reads:

1. An electroluminescent display device comprising an electroluminescent phosphor, a ferro-electric mem-

1. Serial No. 167,128 filed January 18, 1962 as a continuation-in-part of application serial No. 832,290 filed August 7, 1959.

2. No. 3,154,720 issued October 27, 1964 on an application filed April 29, 1960.

ber electrically coupled to said phosphor, and means for providing a distributed bias across said ferro-electric member.

There are two issues on appeal. The first involves the operativeness of the Nicolaou device, which we find to be determinative of appellant's right to make the counts. The second concerns appellee's proof of reduction to practice prior to the August 7, 1959 filing date of the Nicolaou parent application. Since we affirm the decision of the board in regard to the first issue, we find it unnecessary to reach the second.

During the motion period, appellee moved to dissolve the interference on the ground that appellant has no right to make the counts for the reason that appellant has not disclosed an operative apparatus. The examiner denied this motion, and adhered to his decision on reconsideration. Both parties took testimony on the question of operability and, on final hearing, the board decided the issue of operability in favor of appellee. To aid in understanding the board's decision, we reproduce those findings of fact and law relevant to the operability issue:

*Findings of Fact*

\* \* \* \* \* \*

2. The Nicolaou disclosure (Ser. No. 832,290) has a primary object to provide an orthogonal scan in a solid state device which would replace the cathode ray tube for various display, pickup and memory applications in television, radar and computers. \* \*

\* \* \* \* \* \*

4. In describing his Fig. 2, Nicolaou states that the metallic wedge 14 "is assumed equipotential all over its surface" \* \* \*.

5. In describing Fig. 1, Nicolaou states that its performance is identical to Fig. 2 \* \* \* so metallic wedge 15 would also be equipotential.

6. Fig. 3 is described as a combination of Figs. 1 and 2 with the metallic layers adjacent each other.

7. If metallic elements 14 and 15 are equipotential the device is inoperative to perform the scan intended.

8. On page 11 of the Nicolaou specification appears the statement "The metal reflector wedges 14 and 15 are a short circuit in the Z direction but, they have a small resistence in the X–Y direction, enough to prevent the aforementioned spotsized charge to spread in the one frame period and thereby impair the optimum resolution obtainable from the aforesaid Differential Effect."

9. Nicolaou's expert witnesses Chernow and Kindig, testifying in March of 1967, averred that the statement of item 8 would make it obvious to them to leave the metallic plates out.

\* \* \* \* \* \*

Conclusions of Law

1. The statement relative to "small" resistance as set forth in fact 8 is inadequate to teach that metallic plates 14 and 15 should have such a high resistance as to suggest removal of these plates. In fact the teaching of Nicolaou is in the opposite direction. If in describing Figures 1 and 2 Nicolaou had intended layers 14 and 15 to be resistive in a necessary magnitude stated by Chernow (NR–54) to be in a range of $10^6$–$10^7$ ohms per square (which is not "small") for operation he should have so stated. In his description however he specifically referred to the outer layers 12 and 17 as being resistive and layers 14 and 15 as being metallic, element 15 being specifically referred to as aluminum. One who copies a claim from an issued patent must have a clear disclosure which is not supplied by speculation of what one skilled in

the art could make of the disclosure. Brand v. Thomas, 1938 C.D. 467; [96 F.2d 301] 25 CCPA 1053; 37 USPQ 505.

2. We further note that even if the device were modified by removing the metallic plates it would still not be capable of performing the scans or display operations contemplated. The record contains considerable speculation as to how the modified device might be used but none of which are mentioned specifically in the Nicolaou disclosure.

3. We, therefore, are of the opinion that the Nicolaou disclosure is inoperative as disclosed and cannot support the counts.

\* \* \* \* \* \*

Priority of invention is awarded to Michael Cooperman, the junior party.

Appellant alleges that the board, through confusion of the legal tests for right to make the counts and the tests for operability, improperly placed the burden of proving operability on him. In support of this contention, appellant points to the board's citation of Brand v. Thomas, 96 F.2d 301, 25 CCPA 1053 (1938), which involved a right to make issue. We, too, are somewhat confused by the citation of Brand v. Thomas. If it was cited to indicate that appellant had the burden of proving that the device disclosed in Nicolaou was operable or could be made operable by one of ordinary skill in the art, this would clearly be in error. Chase v. Gartner, 374 F.2d 914, 54 CCPA 1385 (1967); Field v. Knowles, 183 F.2d 593, 37 CCPA 1211 (1950); Trumbull v. Kirschbraun, 67 F.2d 974, 21 CCPA 758 (1933). The tests and burdens to be applied when operability is in issue were set forth by this court in Field v. Knowles, supra:

The disclosure of an application placed in interference by the Patent Office is presumed to be an operative disclosure, Mark v. Greenawalt, 32 App.D.C. 253, and will not be held to be inoperative unless it is established (by the junior party by a preponderance of the evidence, Trumbull et al. v. Kirschbraun, 67 F.2d 974, 21 C.C.P.A. (Patents) 758, that it can not be made to operate for any practical or useful purpose, Mark v. Greenawalt, supra, by such changes and alterations, short of invention, which one skilled in the art would be capable of applying in constructing the device with the disclosure of the specification and the drawings of the application as his guide. \* \* \* The capacity to perform in the manner intended, though only in a crude way, is sufficient, Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 66 L.Ed. 112; Williams v. Handschiegl, 48 F.2d 395, 18 C.C.P.A., Patents, 1176.

However, despite the board's reliance on Brand v. Thomas, we conclude that it properly placed the burden on appellee to show both that the device disclosed in Nicolaou is inoperative and that it could not be made to operate by making changes obvious to one of ordinary skill in the art. From our review of the board decision, it seems clear that the board felt appellee had satisfied this burden of proof. We must agree.

The Nicolaou disclosure is a particularly poor one in that it is difficult to follow, contains conflicting statements, and is often technically and theoretically inaccurate. Appellee suggests that the board cited Brand v. Thomas to support the position that the testimony of appellant's expert witnesses involved too much speculation as to how one of ordinary skill in the art could modify the Nicolaou disclosure to make the device operable and that such speculation actually went beyond that which would be obvious to one skilled in the art. We agree with appellee that the device disclosed by Nicolaou is inoperable and could not be made to operate in the manner intended without going beyond that

which would have been obvious to one of ordinary skill in the art upon reading the Nicolaou disclosure.

The Nicolaou device is illustrated in Figs. 1–3 of application serial No. 167,-128:

Fig. 1

Fig. 2

Fig. 3

[A3714]

Appellee in his brief describes Fig. 3 as follows:

The display device shown and described by Nicolaou is in the form of a sandwich comprising ferroelectric and electroluminescent wedges with metallic wedges therebetween and conductive or resistive wedges on the out-

side. Fig. 3 * * * shows the metallic wedges 14 and 15 in contact with each other and isolated from the resistive wedges 12 and 17 by the insulating FE wedge 13 and EL wedge 16.

The busbars X and Y are connected in series with a variable DC source 18 and an element 19 which is described as "a source of complimentary [sic] X–Y pair of sawtooth waveforms" * * *. The busbars Y and X' are connected together, and to ground, at the lower left corner of Fig. 3. The busbars X' and Y' are connected in series with a rheostat 22, a variable DC bias source 21 and an element described as a "modulating, superimposed signal of source 20" * * *. Thus, the X–Y sawtooth voltage 19 is applied between busbars X and X', at the sides of resistive wedge 17; and the signal voltage 20 is applied between busbars Y and Y' at the sides of resistive wedge 12.

The board found that Fig 3 is a combination of Figs. 1 and 2 with the metallic layers adjacent each other. We agree, and we find no good reason not to assume that any disclosure with reference to the layers in Figs. 1 and 2 applies also to the identically designated layers in Fig. 3. The board also found, and appellant does not dispute the fact, that if metallic layers 14 and 15 are equipotential, the device is inoperative to perform the scan intended. Nicolaou states in both applications, which for our purposes are the same, that metallic elements 14 and 15 may be aluminum and that each "is assumed equipotential all over its surface * * *." At another point in the Nicolaou disclosure, it is stated that "[t]he metal-reflector wedges 14 and 15 are a short-circuit in the Z direction but they have a small resistance in the X–Y direction, enough to prevent the aforementioned spot-sized charge to spread in the one frame period * *." Appellant contends that one of ordinary skill in the art would interpret the term "small resistance" in comparison to the resistance of the ferroelectric layer 13

and electroluminescent layer 16, and thus would know that metallic layers 14 and 15 must not be "equipotential" or of "small resistance" but must have a relatively high resistance in order for the device to operate in any manner. Appellant's expert witnesses suggested that an even better solution to having layers of high resistance between layers 13 and 16 would be the removal of layers 14 and 15 entirely.

In our opinion, it is doubtful that layers 14 and 15, being of aluminum, could have as high a resistance as appellant's expert witness, Dr. Chernow, stated was necessary, and certainly there is no suggestion in Nicolaou that layers 14 and 15 have a high resistance.

The question remains, however, whether it would have occurred to one of ordinary skill in the art to remove metallic layers 14 and 15. We agree with the board that appellee has proven that this would not be obvious for the reason that even then the device would not operate as an electroluminescent display device. Witnesses for both appellant and appellee testified that by removing layers 14 and 15 a type of scan could be obtained, but that it would be a moving curved line of light which would never completely cover the panel. It is noted that it has been held that the capacity to perform in the manner intended, though only in a crude way, is sufficient for operability. Field v. Knowles, supra. The scan which would result after removing layers 14 and 15 would not, however, in our opinion even in a crude way show a capacity to perform in a practical manner as an electroluminescent display device. One skilled in the art would have to have a reason for removing layers 14 and 15, and it is not believed he would do so merely to achieve an incomplete curved scan which would not, in our opinion, serve any practical electroluminescent display purpose.

Appellant's expert witnesses speculate that the Nicolaou device with layers 14 and 15 removed and with other modifications, including placing a slit over the face of layer 17, might possibly be used

as a meter even though the scan is incomplete and curved. These speculations go beyond that which we feel would be obvious to one of ordinary skill in the electroluminescent display device art. In the absence of a practical reason for doing so, we do not believe one of ordinary skill in the art would attempt to modify the Nicolaou device in the manner suggested by appellant.

Appellee's expert witness, Dr. Lechner, testified that numerous changes would have to be made in the Nicolaou device in order to produce an electroluminescent display device having even a one dimension scan. Dr. Lechner testified that these changes would include removal of layers 14 and 15, replacement of resistive layer 17 with a conductive layer, removal of sources 18 and 19, removal of the connection between busbars X prime and Y, etc. We do not believe that these changes would have occurred to one skilled in the art seeking to make the device disclosed by Nicolaou operable, nor has appellant argued that they would have been obvious.

Therefore, we affirm the decision of the board.

Affirmed.